Steinhauser v. Spraul.

---

STEINHAUSER v. SPRAUL, *Appellant.*

In Banc, March 19, 1895.

1. **Master and Servant:** DEFECTIVE APPLIANCE: NEGLIGENCE. A domestic servant who was directed by the wife of her employer to get pigeons from a loft and used a ladder made for the purpose which, though sound, was not adapted in length to the height of the loft, can not recover for injuries received from a fall while attempting to enter the loft, it appearing that she had several times before used the ladder with safety and knew as much about its use for the purpose as did her employer. (BRACE, C. J., GANTT and BURGESS, JJ., dissenting.)

| | |
|---|---|
| 127 | 541 |
| 63a | 387 |
| 127 | 541 |
| 69a | 263 |
| 127 | 541 |
| 155 | 381 |
| 127 | 541 |
| 166 | 378 |
| 167 | 113 |
| 127 | 541 |
| 168 | 1314 |
| 168 | 2314 |
| 127 | 541 |
| 172 | 6 64 |
| 96a | 2678 |
| 98a | 6560 |

2. ——: ——: ——: ASSUMPTION OF RISK. The servant in such case assumed the risks of executing the order which was a duty within the range of her employment as a domestic servant. *Ib.*

3. ——: INJURY TO THIRD PERSON: LIABILITY OF SERVANT: NEGLI-GENCE. A servant who, by negligence in the discharge of his duties, injures a third person, is not personally liable to such third person. In such case the maxim *respondeat superior* obtains, the principal is liable for the injury and the agent is is then liable to the principal for damages which the latter may have sustained. (Per SHERWOOD, J. ROBINSON, J., concurring.)

4. ——: ——: ——: ——. The agent, however, is personally liable to third persons for misfeasances and positive wrongs not done in the course of his employment. *Ib.*

5. ——: ——: ——: ——. Where a wife ordered a domestic servant in her husband's employment to procure pigeons from a loft, and the servant, in obeying the order, used a ladder furnished for the purpose by the husband which was longer than the height of the loft and was injured in consequence, the wife was acting as the husband's agent in giving the order and is not liable in damages for the injury. *Ib.*

6. ——: APPLIANCES. In cases where the risk of injury in the use of tools is small, the requirement of the master to use ordinary care in furnishing implements is discharged by furnishing primitive and in-efficient instruments. *Ib.*

## *Appeal from St. Charles Circuit Court.*

REVERSED.

Action for damages. The substantial portion of the petition is as follows:

"That, heretofore, to wit, in the month of ——, 1887, she was engaged by Erwin Spraul, then husband of defendant, but since deceased, as a cook at his residence, and that she continued in her said employment for said Spraul until about the first day of June, 1889; that while she was thus engaged, she was under the direction and control of defendant, the wife and agent of said Erwin Spraul.

"And plaintiff further states, that, heretofore, to wit, on the eighth day of May, 1889, and while in the

service aforesaid, and performing the duties as cook as aforesaid, under defendant's directions, defendant carelessly and negligently ordered plaintiff to climb up a ladder and into the pigeon loft, which occupied the upper portion of a shed situated in the rear yard of said Spraul's then residence, number 3040 South Ninth street, in the city of St. Louis, and fetch some pigeons therefrom, defendant well knowing that it was dangerous for a woman to climb into said loft, and well knowing that the ladder was supplied for that purpose, and which she directed plaintiff to use, was not adapted to that use, but by reason of its length could not be used in climbing into said loft with safety; that defendant knowing the dangerous character of the task she assigned plaintiff, and that the ladder furnished for performing it was not adapted for such use, but unsafe and dangerous for such purpose, nevertheless negligently commanded plaintiff to climb into said pigeon loft.

"Plaintiff further states that, in attempting to comply with said command and climb up said ladder into said loft, having ascended said ladder to the height of the opening into said loft, and while attempting to enter said opening, she, plaintiff, owing to the improper length of said ladder, fell therefrom to the ground below, thereby fracturing her hip bone in such a manner that she was confined to her bed for many weeks and will be permanently crippled. Plaintiff further states that she has suffered great pain of body and mind since the happening of said accident, has been prevented from following her occupation and put to great expense for medicine and medical attendance, all as a result of said accident.

"Wherefore plaintiff prays judgment against defendant for $20,000 and her costs."

The answer was in effect a general denial coupled with a plea of contributory negligence. The reply was

also in substance a general denial of the allegations of the answer.

Plaintiff's testimony is substantially this:

"I am the plaintiff. I know Mrs. Gruen; I worked at her house in St. Louis.   *   *   *   I began working December 13, 1887; worked two years and five months up to the time I was hurt.   Just before I was hurt she said: 'Anna, go up and get down the pigeons, so that grandmother can clean them before she washes the dishes.' I went there. I stood the ladder as always, and as I wanted to enter I lost my hold and fell.  *  *  * The step of the ladder did not fit with the entrance.   I had to stand the ladder against the smaller shed.   The right side of the ladder was on the north side of the big shed.   The top of the ladder extended over the little shed.   The door when open did not go back against the shed; a little platform the pigeons sat on was there. Mrs. Spraul had sent me up the ladder before.   She asked me why I did not stand the ladder over further, and said I would fall down there some time.   I told her I could not stand it any other way because the ladder did not fit.   *   *   * I used the ladder from which I fell about four or five times. It was the height of the big shed.   This was the only ladder about for the purpose of climbing into the shed.

"The ladder was made in the brewery.   *   *   * I got the pigeons out of the loft four or five times a year.   Mrs. Spraul had the ladder made for the purpose of getting the pigeons out.   It was not used much otherwise.   There was an old ladder there at first; it went to pieces.   I have told all Mrs. Spraul said about getting the pigeons.   *   *   * I got the ladder from a corner on the north side of the lot, and set it up against the shed just the same as I always did.   Mrs. Spraul did not tell me how to set it up.   I set it up the best way I could.   I had to crawl into the opening.   I did

not get quite to the opening. I opened the door the same as I had always done before. I had to lean over diagonally. It is about a good step. I had made that step as often as I went up. I took hold of the door. * * * . I lost the hold of my hands and feet. When I was off the ladder and wanted to enter the opening, I lost my hold of the loft at the opening. I stood on the ladder and put my hands on the opening; I wanted to step into the hole, and in so doing I lost my hold on the loft and fell. I had to get off the ladder. I had gotten off the ladder and got on the pigeon loft. * * * I fell on the bricks, not on the wood lying there. I was hanging by my hands from the bottom of the loft and fell down. From the bottom of the opening where I laid my hands to the walk was about eleven feet. * * * I did the best I could. Nobody told me how to enter. I am thirty years of age. The ladder was new. * * * I could not help letting loose. I held on as long as I could. I called to no one to help me. * * * When I went up there I did not know I was going to fall down or I would not have went up there. I just noticed that it was dangerous after I had fallen down. I did not take any notice of whether the ladder was perfectly good to do that thing with or not.

"The old ladder was better. I could put that under the opening and get right into the loft. The other ladder I had to stand at this place and get in sideways. The old ladder broke and the new one was made. There was a step ladder there but I could not use it for this purpose; it was seven or eight feet long and was used to clean the windows. The top of the ladder when I fell from it, rested against the small shed, which was seven inches from the opening. With the ladder placed similarly I went into the loft four or five times. I used the ladder in the same way. If I had had a ladder

which I could have placed under the opening, I could have gone in that way.

"*The Court*: State what caused the accident this time. *Answer*. I lost my hold; I caught hold of the opening with my hands and my hands slipped. I held myself in the corner, in the bottom of the opening at the side and bottom. I had to go in with my head first. I wanted to put my hands in the corner of the opening, slip in my head and body in that way. That was the way I always did. I tried it this time, but my hands slipped and I fell down."

There was evidence that immediately after the accident, defendant sent another female servant after the pigeons, and that she went up the same ladder and got them. There was evidence also that other servants had used the same ladder in getting pigeons down from the loft; that Erwin Spraul, the deceased husband of defendant had the new ladder made; that after plaintiff had fallen as aforesaid, defendant had ordered the top of the ladder to be cut off, which was done; that the ladder was higher than the big shed; that the bottom of the opening into the shed where the pigeons were, was eleven feet one inch; that the plaintiff's father, some six weeks before she fell, had told defendant that the ladder "was dangerous," but did not say in what respect; that the main shed was sixteen feet, two and one half inches high, and the lower shed was twelve feet, ten inches high and distant about eleven inches from the taller shed where the pigeons were.

At the close of evidence for plaintiff, defendant asked an instruction in the nature of a demurrer to the evidence, which was refused.

Thereupon, on part of defendant, evidence of one witness was introduced that plaintiff said to her a short time after the accident, "I fell, unluckily. I have gone up the ladder so often to get pigeons and nothing hap-

pened, and on this day I had to be unfortunate, but I can not blame anybody."

Another witness testified that he asked plaintiff about the matter: "What did you do? and she said, I and Susan had made humbug in the yard; I made a false step and fell down; she further said, I can't blame anybody." Two other witnesses testified to similar statements made by plaintiff as that testified to by the first witness for the defense. Part of this testimony plaintiff denied, to wit: that she admitted she had said it was her own fault and she did not blame anybody; but as to the testimony of two witnesses that she had "made humbug in the yard" etc., she merely said, "I do not remember talking about this accident," etc.

Defendant testified that plaintiff was making fun with Susan (the other hired girl) by putting her foot out and while making fun made a false step and fell. This testimony of defendant's was not denied by plaintiff. Defendant also testified that on one occasion she "used the ladder in fun to look into the loft."

Erwin Spraul died before this suit was instituted. It did not appear that defendant had any means or estate of her own at the time of the accident, nor at what time the ladder was sawed off. The jury returned a verdict for plaintiff for $3,000, and defendant appeals.

This cause has been here once before, and is reported in 114 Mo. 551. The facts however were not as fully developed heretofore as at the present time.

*Broadhead & Hezel* and *H. A. Haeussler* for appellant.

(1) There was no evidence to warrant the court permitting the case to go to the jury under the pleadings and respondent's own evidence. Appellant's instruction at the end of plaintiff's case should have been

given. There was no evidence tending to show appellant directed plaintiff to climb up a ladder; nothing to show she knew the ladder used was too long; nothing to show that any defect in the ladder caused the injury or that it was defective, but that, on the contrary, the cause of accident was respondent's negligently losing her hold and falling, after having gotten off of the ladder. *Wilson v. Tremont Mills*, 159 Mass. 154; *Lane v. Colton*, 12 Mod. 488, and cases cited; Sh. & Red. on Neg., section 244 (or section 112 in third edition). (2) Instructions should be confined to the issue raised by the pleadings and the evidence, and this was not done in instruction number 1 (page 23, abstract); in this, that the question of the safety of the ladder was not confined to its length, and in declaring as a matter of law that it was negligent in defendant to command plaintiff to climb into the loft, if she knew it was necessary for respondent to use a ladder not reasonably safe, and not qualifying the question of safety to the averments in the petition, *i. e.*, as to length, and not referring to the danger, if any, in getting from the ladder to the loft; and the third instruction has the same defect. *Bank v. Murdoch*, 62 Mo. 70; *Greer v. Parker*, 85 Mo. 107; *Frederick v. Kinger*, 17 Neb. 366; 2 Thompson on Trials, sec. 2309. (3) Respondent's instruction number 3 is defective. Respondent was bound to exercise ordinary care and prudence, and, if by the exercise of such care and prudence she would have known that the ladder was unsafe by reason of its length, or did, in fact, know it from being warned or from repeatedly using it, and by reason of a failure to exercise such care and prudence, or from accidentally slipping, she was injured, she can not recover. This instruction is also fatally defective in omitting to confine the defect or improper character of the ladder to its length. (4) Instruction number 4 is defective in that

the degree of care required of plaintiff was limited to such care as a careful and prudent house servant or cook would have exercised under like circumstances, without reference to the fact that plaintiff had repeatedly used the ladder to enter the loft in her own way, without any direction as to how to use it, and was a person of mature years. (5) The law imputes to appellant no superior wisdom in this case, and respondent must be held to have understood the risk and to have voluntarily incurred it. Moreover, the order to get the pigeons was the husband's order through the wife; the order to use the ladder was the general order of the husband when he furnished it for that purpose. (6) If appellant, the wife of a resident of a city, not shown to be imprudent, and having no superior knowledge of use of ladders, would not have supposed the accident that did happen could have happened to respondent, she is not liable therefor. A reasonable probability of such a result is all that the law implied should be guarded against by her, and she had a right to take it for granted that the ladder furnished by husband to this servant and used by her repeatedly was safe for the purpose for which it was to be used, and had been voluntarily, in her own way, repeatedly used by such servant without any complaint. *Porter v. Anheuser*, 24 Mo. App. 6. (7) The motion in arrest should have been sustained. Respondent, at time of accident, in 1887, was wife of Erwin Spraul, since dead, and was, when sued herein, wife of John Gruen, as admitted by pleadings. *Flesh v. Lindsay*, 115 Mo. 1.

*J. Hugo Grimm* for respondent.

(1) *First*. It was decided by this court, on the former appeal, that there was sufficient evidence to take the case to the jury. *Steinhauser v. Spraul*, 114

Mo. 551. *Second.* That decision is *res judicata* and appellant is bound by it and can not question it. *Bank v. Taylor*, 62 Mo. 338; *Keith v. Keith*, 97 Mo. 223; *Hombs v. Corbin*, 54 Mo. App. 393. *Third.* This court having upon a former appeal considered this whole case in all its aspects and remanded the same with instructions, the parties to this suit are bound by the decision of this court upon every point, and if the trial court followed the instructions of this court and tried the case upon the theory decided by this court to be the correct theory of this case, then there are no questions that can be raised in this case, except such as regard the instructions, for no exceptions are saved to any rulings upon the evidence. The case was tried in all respects in accordance with this court's opinion. *Shroyer v. Nickell*, 67 Mo. 589; *Lackland v. Smith*, 75 Mo. 307; *Southwest Co. v. Ins. Co.*, 41 Mo. App. 406; *McKinney v. Harral*, 34 Mo. App. 337. (2) An examination of the record will show that plaintiff and defendant tried this case upon the same theory, that declared by the court to be the correct one, and that the instructions on both sides present the same theory. The only objections, therefore, that can be presented to plaintiff's instructions are purely formal ones. *Harrington v. Sedalia*, 98 Mo. 583; *McCullough v. Railroad*, 34 Mo. App. 23; *Thorpe v. Railroad*, 89 Mo. 650; *Bank v. Hammerslough*, 72 Mo. 274. (3) The second instruction given for defendant expressly refers to the "defect in the length of the ladder" showing that this was the only insufficiency in question; and defendant's fifth instruction expressly told the jury that they must find for the defendant, unless they found "that the ladder was in fact too long," etc. Hence the jury could not have been misled, nor defendant prejudiced by these instructions, particularly since all the evidence upon the question of the unfitness of the ladder was that it

was too long, and there is no ground for reversal. *Morris v. Railroad*, 79 Mo. 367; *Breckenridge v. Ins. Co.*, 87 Mo. 62; *Haskins v. Railroad*, 58 Mo. 302; *Filley v. McHenry*, 84 Mo. 277; *Patton v. Weightman*, 51 Mo. 432; *Valle v. Picton*, 91 Mo. 207. (4) If the defendant thought these instructions were not explicit enough, she should have asked for more explicit instructions. *Brown v. Railroad*, 13 Mo. App. 462; *State ex rel. v. Donnelly*, 9 Mo. App. 519; *Koehler v. Wilson*, 40 Iowa, 183; *Sellick v. Turnpike Co.*, 13 Conn. 455; *Hyde v. Co.*, 32 Mo. App. 298; *State ex rel. v. Haas*, 6 Mo. App. 586; *Cahill v. Co.*, 14 Mo. App. 596. (5) The fourth instruction defining the degree of care plaintiff must exercise was correct. *O'Mellia v. Railroad*, 115 Mo. 212. The five instructions given at defendant's request fully presented every phase of the case. *Hanby v. Brasher*, 51 Mo. 439; *Porter v. Harrison*, 52 Mo. 524; *State v. Holme*, 54 Mo. 153. (6) When this suit was brought defendant had no husband; again, the statute (R. S. 1889, sec. 6864) allowing a married woman to sue and be sued in her own name, without joining her husband, was in full force and effect at that time. It will hardly be contended that defendant's present husband is liable for the torts she may have committed during the lifetime of her former husband. (R. S. 1889, sec. 6870). As he married defendant only after this suit was brought, and as he was not liable in the action there was no excuse for bringing him into the case. Nor has any question been made heretofore on account of his nonjoinder.

DIVISION TWO.

SHERWOOD, J.—I. Various grounds have been assigned for the reversal of the judgment in this cause, some of which will now be considered,

The theory on which this cause was tried in the court below was that defendant was the wife and agent of her then husband Erwin Spraul, and as such gave the command which it is claimed indirectly resulted in the litigated injury. The whole case turns on the point whether, in giving such order, defendant was guilty of a mere omission of duty or negligence, while acting within the scope of her implied authority derived from her husband, or whether she was guilty of an actionable *misfeasance*.

In a very early case, Chief Justice HOLT clearly drew the distinction between the nonliability of a person to a third party because of negligence, or nonfeasance and misfeasance, or positive wrong, saying: "It was objected at the bar, that they have this remedy against Breese. I agree, if they could prove that he took out the bills, they might sue him for it; so they might anybody else on whom they could fix that fact; but for a neglect in him they can have no remedy against him; for they must consider him only as a servant; and then his neglect is only chargeable on his master, or principal; for a servant or deputy, *quatenus* such, can not be charged for neglect, but the principal only shall be charged for it; but for a misfeasance an action will lie against a servant or deputy, but not *quatenus* a deputy or servant, but as a wrongdoer. As if a bailiff, who has a warrant from the sheriff to execute a writ, suffer his prisoner by neglect to escape, the sheriff shall be charged for it, and not the bailiff; but if the bailiff turn the prisoner loose, the action may be brought against the bailiff himself, for then he is a kind of wrongdoer or rescuer; and it will lie against any other that will rescue in like manner." *Lane v. Cotton*, 12 Mod. 488.

In commenting on the case just cited, the rule is tersely stated: "That an agent is personally liable to

third parties for doing something which he ought not to have done, but not for not doing something which he ought to have done. In the latter case the agent is liable only to his employer." Ewell's Evans on Agency, p. 438.

On this topic, an eminent commentator observes: "We come, in the next place, to the consideration of the liability of agents to third persons, in regard to torts or wrongs done by them in the course of their agency.  *  *  *  And here the distinction ordinarily taken is between acts of misfeasance or positive wrongs and nonfeasances or mere omissions of duty by private agents.  *  *  *  The master is always liable to third persons for the misfeasances and negligences and omissions of duty of his servant, in all cases within the scope of his employment. So the principal, in like manner, is liable to third persons for the like misfeasances, negligences, and omissions of duty of his agent, leaving him to his remedy over against the agent in all cases, where the tort is of such a nature as that he is entitled to compensation.  *  *  *  The agent is also personally liable to third persons for his own misfeasances and positive wrongs. But he is not  *  *  *  liable to third persons for his own nonfeasances or omissions of duty, in the course of his employment. His liability, in these latter cases, is solely to his principal.  *  *  *  And hence the general maxim as to all such negligences and omissions of duty, is, in cases of private agency, *respondeat superior*.  *  *  *

"The distinction, thus propounded, between misfeasance and nonfeasance, between acts of direct, positive wrong and mere neglects by agents as to their personal liability therefor, may seem nice and artificial, and partakes, perhaps, not a little of the subtilty and over-refinement of the old doctrines of the com-

mon law. It seems, however, to be founded upon this ground, that no authority whatsoever from a superior can furnish to any party a just defense for his own positive torts or trespasses; for no man can authorize another to do a positive wrong. But, in respect to nonfeasances or mere neglects in the performance of duty, the responsibility ·therefor must arise from some express or implied obligation between particular parties standing in privity of law or contract with each other; and no man is bound to answer for any such violations of duty or obligation, except those to whom he has become directly bound or amenable for his conduct." Story on Agency [9 Ed.], secs. 308, 309.

It will be pertinent, in this connection, to briefly note the facts and rulings in some early cases which serve to illustrate what has been quoted from the text writers. Thus in *Bell v. Catesby*, Roll. Abr., 78, pl. 20, it was resolved that if an underbailiff of a liberty levy a debt by virtue of a warrant of *fieri facias*, and then conceal the writ, and make no certificate, an action on the case lies against him; for this reason, that he has done a personal tort. Vid. 1 Vin. Ab. 573. In *Marsh and Astrey's Case*, 1 Leon. 146, an undersheriff was held liable for returning a tenant summoned when he was not, upon the ground that this was a positive act, and not a mere negligence. In *Cameron v. Reynolds*, 1 Cowp. 403, it was held that an action did not lie against an undersheriff for refusing to execute a bill of sale to plaintiff under a *fieri facias*. And Lord MANSFIELD said: "It is an action * * * for a breach of duty in the office of sheriff. Wherever that is the case, the action must be brought against the high sheriff * * *; and if it proceeds from the default of the undersheriff or

bailiff, that is a matter to be settled between them and the high sheriff."

These cases all go to point out the essential difference which exists between *"acts of direct and positive wrong"* which are *misfeasances*, and render the agent personally liable, and *"mere neglects"* or nonfeasances in which the liability is cast alone on the principal or master. This distinction finds illustration in *Harriman v. Stowe*, 57 Mo. 93, where the defendant, acting as the agent of his wife, and being a carpenter, built a trap door, and did the work so negligently that a third person fell through the hatchway, which the door covered, and was injured, and it was held that the party injured was entitled to recover of the agent on the ground that the act which caused the injury, viz.: defectively constructing the trap door, was a *misfeasance* as contradistinguished from a mere nonfeasance or omission of duty, and this was thus ruled after extensive and approving citations and quotations from Story and other authorities heretofore cited.

In *Horner v. Lawrence*, 37 N. J. L. 46, this case arose: Forsyth, owning a strip of woodland through which a railroad ran, procured the wood to be cut, and employed Horner to haul it. Horner, in order to reach said woodland, obtained permission from Lamb, the owner of an adjoining field, where the hogs of Lawrence were being pastured, to pass through the filed and to open a gap in the fence at a certain place, with directions to close it up after he went in and after he came out, as the hogs and cattle in the field might get through on the railroad and get killed; and Horner passed through with his teams, leaving the gap open while the wagons were being loaded, but closing it when he went out; the hogs escaped through the gap and one was killed and the other injured on the railroad; *held*, that the leaving down the bars

by Horner was not a mere *neglect*, but an intentional and willful violation of his authority, and a *misfeasance* for which, as a servant or agent of Forsyth, he can not claim exemption against the party injured.

In Mississippi, a very marked illustration of the point in hand has occurred, where it was ruled that an agent in charge of a plantation was not liable to the owner of an adjoining plantation for damage resulting from the *malicious neglect and refusal* of the agent to keep open a drain which it was his duty as such agent to keep open; and that the only liability incurred by the agent was to his principal. *Feltus v. Swan*, 62 Miss. 415.

As heretofore seen from the authorities cited, they generally announce the doctrine that, in order to charge the agent with liability, such liability must spring from, and have its origin in, *an act of direct and positive wrong* done by the agent to the injured party. This idea is happily expressed in *Delaney v. Rochereau*, 34 La. Ann. 1123, where BERMUDEZ, C. J., says: "The whole doctrine on that subject culminates in the proposition that, wherever the agent's negligence, consisting in his own wrongdoing, therefore in an act, *directly* injures a stranger, then such stranger can recover from the agent damages for the injury. Story on Agency, 308, 309; *Ib.* on Bailments, 165; Shearman & Redfield on Negligence, [Ed. 1874], 111, 112, Evans on Agency, Notes by Ewell, 437, 438; Wharton on Negligence, 535, 78, 83, 780."

"By Anglo-American law, a servant who by negligence in the discharge of his duties injures a third person is not personally liable to such third person. The maxim *respondeat superior* prevails; the principal is liable for the injury, and the agent is then liable to the principal for damages which the latter may have

sustained." Wharton's Commentaries on Agency and Agents, sec. 535.

Now in this case nothing can be clearer than that defendant was acting within the orbit of her duty to her husband when giving the order alleged in the petition. This is the theory of the petition which claims that the command was negligently given, owing to the fact that the ladder furnished for climbing into the loft, by reason of its length, could not be used for that purpose with safety. So that it readily appears that defendant in giving the order was not guilty of *an act of direct and positive wrong* to plaintiff, but simply of giving an order *in her husband's business*, which, solely owing to the length of the ladder, furnished by her husband, for the purpose, and she having no other, was a negligent order. But it must be remembered that *it was no part of defendant's duty to furnish a ladder of proper length*, nor does it appear she had the wherewithal to do so. If it was not her duty, then she can not be charged with even so much as negligence in failing to provide a ladder of requisite length; for negligence is simply duty violated or unperformed. The mere giving of the order, then, to get the pigeons was not a negligent order. It was her husband's duty to furnish a ladder of proper length, and it is the rule that a servant is never liable for the negligence of his master, nor can an action be maintained against a servant, unless he can be considered as a *wrongdoer*. A servant is never liable to a third person merely for not doing that which it was the duty of the master to do. *Hill v. Caverly*, 7 N. H. 215. Thus, where a master, having an unsafe and insufficient dam across a stream of water, ordered his servant to shut the gate and keep it shut until ordered to raise it, and the servant obeyed the order, by means of which the water was raised so high that the

dam broke away, and an injury was done to a third person, it was held that the servant was not liable. See, also, Bishop on Non-Contract Law, secs. 695, 628, 446.

With respect to the use of the word *misfeasance* by Lord HOLT in the passage already copied, the learned author heretofore quoted says: "For *negligences*, Lord HOLT tells us, the servant is not liable; for *misfeasances* he is liable. If we are to understand by negligences, in Lord HOLT's sense, those imperfections in the discharge of duty which are incident to the labor of all men when under the control of others, and if we are to regard as misfeasances those torts which are committed by the servant out of the line of his employment, when acting on his own responsiblity, then we can reconcile the famous passage just quoted not only with the principles here advocated, but with the analogies of the law in other relations." Wharton's Commentaries, Agency and Agents, sec. 536.

This view accords with the views of Story and others, as to the distinction between "mere neglects" and misfeasances or positive wrongs, and conclusively shows that defendant, not having crossed the boundaries of her implied employment, was in nothing derelict and in nothing liable so far as concerns plaintiff. There are cases, indeed, where an order when given by an agent results in direct injury to a third person, and the agent there will be held liable to the person injured.

Thus in *Bell v. Josselyn*, 3 Gray, 309, it was ruled that an agent, who negligently directed water to be admitted to the water pipe in a room of his principal's house, over which he had general management, thereby flooding a tenement below, was personally liable. There, it was held that it was an act of mere *nonfeasance* on the part of the defendant to fail to examine

the condition of the pipes before causing the water to be let on, but that the turning on of the water without such precedent examination was a *misfeasance*, and none the less so because preceded by a *nonfeasance*, and so the action of tort against the defendant was maintained. In that case, however, the agent was acting in an *independent sphere of action;* "pursued his own way" and consequently occupied a different and higher plane of liability than the defendant wife in the case at bar, owing to her subordinate position in the household and the matrimonial relations she sustained, because when the agent, by the negligent performance of his ordinary duties, injures a third person, only the principal is liable if the agent's individuality is absorbed in that of the principal; for wherever there is liberty there is liability and *vice versa.* Wharton's Agency, secs. 537, 538.

This further difference between the case instanced and the present one consists in the fact that the order in that case was as much a *direct and positive wrong* as though the *fingers* of the agent had turned the water on instead of his *tongue.*

There are cases, too, of *omission* which may result in liability, and this illustration is given in the Digest in the discussion of the Aquilian law: "One servant lights a fire and leaves the care of it to another. The latter omits to check the fire, so that it spreads, and burns down a villa. Is there any one liable for the damages? The first servant is chargeable with no negligence, and the second chargeable only with an omission. Of course, if we apply to this case the maxim that a mere omission can not be the basis of a suit, there be no redress." In such case the eminent author from whom quotations have already been made, says: "It is clear that in the case before us the *nonaction* of the second servant is equivalent to *action.* He undertakes

the charge of the fire, and in the imperfect performance of this charge he acts *aggressively and positively*. So, also, is it in the well known case of a physician who undertakes the care of a patient." Wharton on the Law of Negligence [2 Ed.], sec. 80.

Of course, no such *"aggressive and positive"* omission can be laid at the door of defendant, and consequently no such liability as springs from an omission of that sort.

There are cases where a servant is liable to his fellow servant for negligence resulting in injuries to the latter; but it is believed it will be found upon examination that no such liability attaches except where some *physical act* is done by the servant, and results to the damage of his fellow, or where the servant occupies an independent plane, and his *orders* to his fellow servants are equivalent in force, effect and resultant injury to a *physical act*, as in *Bell v. Josselyn, supra*.

Where the servant acts as the master's representative *"without liberty,"* he is not responsible for injuries to his fellow servant resulting from his negligence, unless those injuries are either directly or in effect *positive physical wrongs*, for which he would be legally liable were he acting *without,* instead of *with,* orders. Whart. on the Law of Neg. [2 Ed.], secs. 245, 246; Whart. Ag., sec. 535.

The case of *Osborne v. Morgan,* 137 Mass. 1, affords apt illustration of the principle which renders liable an agent who, acting in an *unfettered way,* has the general conduct and control of affairs, and gives an order which necessarily and immediately results in injury to an inferior fellow servant. There, the order given by the general superintendent should not have been given, because, as said by DEVENS, J.: "A single careful glance would have shown the hazardous condition in

which the machinery was to be left   * * *   and which the execution of the order made dangerous." There the order was the *legal equivalent* of a direct and physical wrong, as much so as though the *hands* of the general superintendent had removed the closet instead of the hands of his subordinates. In that case, too, an instruction was approved that "the plaintiff must show, in regard to the defendant, *he would hold, that that defendant had a duty in regard to the use of the apparatus, keeping it in repair and in condition to use, put upon him by the corporation.*"

*Rogers v. Overton*, 87 Ind. 410, is another instance where an inferior fellow servant suffered injury as the direct result of an order of his superior fellow servant for which the latter was held liable.

There are cases also where husband and wife, either one or both, as the circumstance happened, have been held liable for their joint or several torts. Many of these cases have been exhaustively cited and reviewed by Burgess, J., in *Flesh v. Lindsay*, 115 Mo. 1. But in none of those cases, and in none which a careful research has been able to discover, has a single instance been found where a *wife*, in giving her orders in and about her *household affairs* to one of her domestics, has been held liable for injuries resulting to such servant. And the fact that no such precedent can be found is cogent evidence that such a rule of law does not exist. *Venable v. Railroad*, 112 Mo. 103, and cases cited.

And certainly the nonliability of the defendant wife ought to be the dominant principle in surroundings such as this record presents. Here defendant was environed by the confines of a narrow and limited authority. She was "subdued to the very quality of her lord." She was the *mouthpiece* of her husband, as much so as if she had said, "Anna, *my husband says*

go up and get down the pigeons," in which case it would hardly be contended that defendant could have been held liable to an action.

The premises considered, it seems to me that the circumstances in evidence as disclosed by the record, show no liability on the part of defendant, when considered as acting as the implied agent of her husband.

II.    There are other reasons tending toward the same conclusion of defendant's nonliability.   It is well settled law that an employer is not bound to furnish his employees the safest known appliances, tools or machinery, the latest approved patterns of tools and improvements therein, etc., nor does he render himself liable by failing to discard tools or appliances which are not such, and to supply their places with those which are more safe.   2 Thompson on Neg., p. 983; *Blanton v. Dold*, 109 Mo. 64.

In cases like the present it seems that, the risk of injury being but small, the use of *very primitive and inefficient implements is allowable*, and such use will fill the measure of ordinary care.   The master is not the *warrantor* of the tools furnished his servants; having exercised ordinary care in the selection of the implements, his liability, so far as mere selection is concerned, ceases.   Beach on Contrib. Neg. [2 Ed.], secs. 351, 352, and cases cited.

III.    Again, no principle is more frequently enunciated, or more often applied in the adjudicated cases, than that which holds that an employee, in engaging in the service of another, assumes the risks incident to such employment, and this is especially true of *seen dangers and patent defects*.   Where ordinary inspection and carefulness will enable the employee to avoid the danger, there he will be required to use such inspection and carefulness.   "But it is held that, wherever the employee's means of information are equal to or

greater than those of his employer, the employer * * * will not be liable in case of injury from a defect of that sort. But this is, perhaps, but little more than to say that the servant, as well as the master, is bound to ordinary care. For patent dangers or defects, the master, as a rule, is not liable, and in many cases it has been held that they need not be pointed out, even to minor employees, if the latter be capable of discerning them." Beach on Contrib. Neg. [2 Ed.], sec. 359.

The learned author gives some instances where employers have been held exempt from liability. Thus: "One who works on a raised platform without railing takes the risk of falling off; and a laborer employed to wheel earth along the edge of a bank when the posts are coming out of the ground, is presumed to know the danger and to assume the risk of the bank caving in. Where a servant who was killed by falling through a hatchway knew when he entered the employment that there were no guards around it, he took all risks incident to the employment. So, also, a workman employed by a railroad company to stand in a dangerous place to signal trains assumes the obvious risks of the position, and a railroad track walker, who knew that coal was customarily overloaded on tenders, could not recover for injuries from the fall of a piece of it; and a section hand can not complain of the increased risk in being ordered out to work on a foggy day, nor while pushing a hand car, of falling into a properly constructed waterway, nor the risk from special trains not running on schedule time. One, however, whose employment in a railroad yard requires him to move damaged cars, takes the risk of mistaking damaged cars for sound ones. * * *" *Ib.*, sec. 360.

This doctrine is firmly rooted in this court, and has received its frequent sanction. *Thomas v. Railroad*, 109 Mo. 187, and cases cited; Bishop on Non-Contract

Law, sec. 675, and the quite recent case of *Wilson v. Tremont & Suffolk Mills*, 34 N. E. Rep. 90; *Williams v. Railroad*, 119 Mo. 316; *Fugler v. Bothe*, 117 Mo. 475; *Watson v. Coal Co.*, 52 Mo. App. 366.

The rule is generally applied in actions brought by *employee* against *employer*, but no reason is perceived why the rule should not be equally applicable to the circumstances of the present case. As already seen, the plaintiff was fully conversant with the alleged defect in the ladder; *its length*, for otherwise it was sound. She had ascended it four or five times before, and gotten the pigeons out of the loft without trouble, and as this thing occurred four or five times a year, as plaintiff says she had been using the new ladder a year or more when the accident happened. She had also used the old ladder before it had been discarded. So that it is simply indisputable that if ever the doctrine of the assumption of obvious risks is to be applied, it ought to be applied in the present instance. Being thus applied, the result seems to be inevitable that plaintiff on this ground alone has no cause of action and no standing in court.

For the reasons aforesaid, the judgment should be reversed and the petition dismissed. All concur, except in the last paragraph.

### IN BANC.

PER CURIAM.—The judgment herein is reversed and the petition dismissed, as directed in the foregoing opinion of SHERWOOD, J., in division number two, ROBINSON, J., concurring with Judge SHERWOOD in the opinion, MACFARLANE, J., in the third paragraph, BARCLAY, J., specially, BRACE, C. J., GANTT and BURGESS, JJ., dissenting.

BARCLAY, J. (*concurring*).   Plaintiff, according to her testimony, was employed as a servant to do general housework.   In her petition she states that she was employed as a cook, and that, "while performing the duties as cook," * * * "under defendant's directions, defendant carelessly and negligently ordered plaintiff to climb up a ladder, and into the pigeon loft," etc.

Plaintiff was hurt by falling to the ground while attempting to execute the order of defendant to get the pigeons.   The order, by plaintiff's account, was accompanied with a remark about having the pigeons cleaned before the dishes were washed.   So that it is evident that the pigeons were wanted for cooking, and that the plaintiff was directed to get them for that purpose.

The allegation of the petition is that plaintiff was the servant of Mr. Spraul, the defendant's husband; but that is evidently only a statement of the effect of the employment; for, in her testimony, plaintiff states that the defendant actually engaged her for service in the family.

Defendant had general direction of the household affairs.

Plaintiff had been working as a domestic in the Spraul family, as above described, two years and five months when her mishap occurred.   During that time she had "got the pigeons out of the loft four or five times a year," as she said.   She also admitted that she had previously used the same ladder to reach the loft (from which she fell) "four or five times."   Prior to using that ladder, she had used, for the same purpose, an older one, since discarded.

The pigeon loft was in the upper part of a shed in the yard of the Spraul premises, as has been described.

The ladder plaintiff had to use was not defective. It was made for the purpose, and was new. The only supposed defect charged against it is that it was too long to reach the loft unless placed at a great angle; so plaintiff had to set it sidewise, against another shed.

Plaintiff admitted that defendant had cautioned her as to the use of the ladder. Her words were thus given by plaintiff as witness: "Mrs. Spraul had sent me up the ladder before. She asked me why I did not stand the ladder over further, and said I would fall down there some time. I told her I could not stand it any other way because the ladder did not fit."

Defendant, at the time of the accident, did not direct plaintiff how to use the ladder. Plaintiff was then using the ladder according to her own methods. The ladder did not give way. Plaintiff was not even standing on it when she fell. She says, "when I was off the ladder and wanted to enter the opening" (of the loft) "I lost my hold of the loft at the opening. I stood on the ladder and put my hands on the opening; I wanted to step into the hole; and, in so doing, I lost my hold on the loft and fell. I had to get off the ladder. I had gotten off the ladder and had got on the pigeon loft."

Later on she said: "If I had had a ladder that fitted I would not have fallen. I did the best I could. Nobody told me how to enter."

Without referring to other features of the case (particulars of which are given in the principal opinion filed), it appears to me that on the state of facts above disclosed, the plaintiff can not maintain this action against this defendant.

The appliance in question was a simple one. It required no more than ordinary knowledge for its use. It was sound.

The only danger to plaintiff arose from the mode and manner of its use; and the mode and manner of using it, on the occasion in question, were within plaintiff's own control. She had used it with safety before; and, undoubtedly, knew as much about its use for such purposes as did the defendant.

In my opinion plaintiff can not recover for an injury arising from the manner in which she saw fit to place the ladder in executing the order of defendant to get the pigeons.

The latter was a duty which, it seems to me, obviously came within the fair range of plaintiff's employment as a domestic servant. That, indeed, is the very claim made in her petition.

Hence (without considering other questions) my concurrence is given to a reversal of the judgment on the general ground that defendant is chargeable with no breach of duty, as indicated in the closing lines of the opinion delivered by my learned colleague, Judge SHERWOOD.