**John Louis GREEN, Appellant,**

v.

**Dr. Richard L. SUTTON, Jr., and Mrs. Richard L. Sutton, Jr., Respondents.**

**No. 54054.**

Supreme Court of Missouri,
Division No. 1.

April 13, 1970.

Jack G. Beamer, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for respondents.

Daniel S. Millman, Kansas City, for appellant.

PAUL E. CARVER, Special Judge.

This is an appeal from an adverse judgment of the Jackson County Circuit Court by plaintiff, John Louis Green, who was an employee of Dr. and Mrs. Richard L. Sutton, Jr.

John Louis Green, who was approximately 46 years of age, placed an "ad" in the Kansas City Star, a newspaper published in Kansas City, Missouri, advising the public that he was seeking employment as a household worker. In response to the advertisement for housework, Mrs. Sutton telephoned plaintiff and hired him to remove screens, install storm windows, and generally prepare defendants' home for the winter. On November 6, 1961, plaintiff appeared at the defendants' home, located at 5400 Ward Parkway in Kansas City, Missouri, for work at about 9:00 a. m. Mrs. Sutton showed him what work was to be done. Plaintiff informed Mrs. Sutton that he had previously done housework. With this agreement the plaintiff went to work.

During the morning of November 6, 1961, the plaintiff washed storm windows, installed several storm doors, gathered leaves and removed screens and washed windows from the sun porch. In this work he used a stepladder and a fifteen-foot green wooden ladder. Before starting work, Mrs. Sutton went to the garage with plaintiff and showed him the storm windows and doors, which had already been washed. In the garage there were four ladders which plaintiff could use in his work: two stepladders, a green wooden ladder, and a sixteen-foot aluminum ladder. All of the ladders were in good condition except one stepladder, which was not used by plaintiff. The defendant Dr. Sutton was not present at the time plaintiff went to work, but during the day he returned home and directed the plaintiff to install a small storm window in his dressing room and also to remove the leaves from the porch. Dr. Sutton did not thereafter instruct plaintiff to do anything or tell him anything about the use of the ladders.

Plaintiff was injured while installing a storm window in the sun room located on the second floor of defendants' home when the aluminum ladder which he was using slipped. The aluminum ladder had been placed on the cement driveway. The feet of the ladder were rubber-covered, and from the evidence it appeared to be the usual or standard sixteen-foot aluminum extension ladder. Plaintiff described the aluminum ladder as "looking new". The top of the ladder rested on the window sill of the sun room. While the ladder was in this position, the plaintiff climbed the ladder and carried up with him a storm window. Upon reaching the window where the storm window was to be installed, appellant noticed that the ladder was extended to such a length that it prevented the storm window being placed in the window opening. This was brought to Mrs. Sutton's attention by plaintiff. Mrs. Sutton was at the window of the second floor where the window was to be installed and instructed him to lower the ladder so it would not interfere with the installation of the storm window. Plaintiff then climbed down the ladder, leaving Mrs. Sutton holding the storm window. When plaintiff reached the ground, he adjusted the ladder by lowering it. He then climbed the ladder and attempted to install the storm window. The storm window was attached at the top but would not fit at the bottom of the window opening. There is a conflict in the testimony as to where the ladder was placed at the time of the fall; however, the location is not decisive in the determination of this case. While attempting to install the storm window the plaintiff fell.

The aluminum ladder was described by the plaintiff as looking new and that it was

eighteen feet long, that he first went to the garage and got the ladder where it was hanging. That he asked Mrs. Sutton " * * * did it look all right. She said, 'Yes, that's all right, it's safe.' " Plaintiff then raised one round and it was too tall to permit the insertion of the storm window in the window opening. His testimony being, "I got the [storm] window * * * that wouldn't fit any of the others * * * I tried it * * * and I saw that the ladder was sticking up too high. * * * I told her (Mrs. Sutton) 'The ladder isn't right' and she said 'Go down and let it down'. * * * It was covering part of the window, where the storm window had to go." Plaintiff then climbed down and let the ladder down one round. It was as low as it would go, and plaintiff adjusted it as he knew how. Plaintiff, after adjusting the ladder, placed the top of the ladder on the window sill and shook it. He tested the ladder at least twice, then proceeded to climb it. Plaintiff testified on direct examination as to the fall as follows:

"Q You left the window up—

A Up there with her, yes. When I went back up, the window seemed to go in the top, but it wouldn't go in at the bottom, so I told Mrs. Sutton, I said, 'This window will not fit.' She said, 'Yes, it has to fit. These are the windows that go up here,' so I said, 'Well, I don't think it's going to fit.' She said, 'Yes, it will.' She said, 'You hit it some.' So I asked her, I said, 'I don't think—would it be safe for me to be pounding on this window on this ladder?' She said, 'Yes, that ladder is safe; it's new and safer and we have used it all the time.' So I hit the window maybe once or twice, you know, like that, pushed it in, and the next thing I know, me and the ladder was on the way down.

Q Do you have any way of knowing how the ladder happened to go down?

A No, I don't.

Q You went down with it? A Yes.

Q You fell; did you hit the ground?

A Well, I fell on the cement driveway.

Q Do you recall if you fell on the ladder or aside from it?

A Well, I was on the ladder when I went down, so I couldn't have jumped, so I fell on the ladder.

Q Did you try to jump?

A No, I tried to hold close to the wall at first, and then it just went so quick, wasn't much I could do of anything."

* * * * * *

On cross-examination:

"Q You tested the ladder yourself before you got up on it?

A I kicked on it.

Q What?

A Yes, I adjusted and shook it.

Q As far as you were concerned it was in the right place?

A As far as I knew about that ladder, yes.

Q You tested it both times, at least, before you got up on it, didn't you?

A Tested it how many times?

Q At least twice. A When?

Q That afternoon.

A The first time and the second time.

Q You tested it at least twice? A Yes.

Q That ladder didn't slip one bit until you pushed backward, did it?

A Well, when Mrs. Sutton told me to—

Q Just answer my question.

A Till I did what?

Q Did the ladder slip one bit until you started pushing on that wall or that window?

A I did not push on no wall with the window.

Q I said the ladder didn't slip one single bit until you shoved or pushed on the window.

A Until I hit the window.

Q Until you hit the window, did it?

A No."

*    *    *    *    *    *

Defendant Mrs. Sutton described the occurrence as follows:

"Q Now, did you notice where he placed the ladder on the house when he came up to put this window into place?

A I was not paying any attention to the ladder. * * *

Q Did you notice how far the bottom of the ladder was out from the house?

A No, I didn't.

Q Did you ever tell him to shorten this ladder or move it out from the house or—

A No, I didn't.

Q Was he able to put the window in place the first time he came up the ladder?

A As I recall, he came up the ladder twice.

Q Well, was he able to put it in place the first time?

A No.

Q Did he have to get down and do something with the ladder?

A He got down, yes.

Q Do you know why the window wouldn't fit the first time?

A I think he had it a little too far to the west and he moved it.

Q He moved the ladder?  A  Yes.

Q Did you tell him to move it or not move it?

A I didn't tell him to move it.

Q Did he come back up a second time?

A Yes, he did.

Q And did he get the window into place this time?

A He put it in place and I had hold of the latch at the top.

Q * * * Now when he put this window into place, how did he do it?

A You just place it in; it's in two sections, the big window is divided into two sections for the storm windows, and you just insert it straight.

Q Did he slide it in from the side like he said at one time?

A No, just put it in straight, like that.

Q And he did have the top of it in and you were holding the top?

A I was holding the latch in.

Q Was he pushing on the bottom or do you know?

A I am not sure what he was doing. We were trying to get it in.

Q Did you tell him to push on the ladder or the window?

A Not that I recall.

Q Do you know how or why he fell?

A The ladder began to slip, I know that.

Q Which way did it slide?

A It slid back and out, down.

Q Was this while he was pushing on the window?

A I'm not sure. I just noticed that it was slipping and he was on it.

Q And he did fall then? A He did fall.

Q Now, when he fell, did he fall straight or to the side or—

A He scrambled around on the ladder trying to save himself, of course, and he did not fall on top of the ladder.

Q To which side did he fall?

A He fell on the east side of the ladder"

\* \* \* \* \* \*

"Q And as you say, you do not remember too much about the details, but can you give us an idea of which way the ladder went down from where it was located against the house?

A I was concerned more with the way John, Mr. Green, was going than where the ladder went. It just seemed to slip out.

Q But you saw enough to tell that the bottom went out in the direction it was heading and the top followed it down and so did John?

A John scrambled around, Mr. Green scrambled around trying to save himself, I imagine.

Q Did he apparently try to catch a ledge or whatever may have been?

A No, because—I don't remember that he did. He just scrambled as if he were trying to get off of there, and he fell clear of the ladder.

Q When you say scrambled, could it also have been an effort to jump?

A Something like that. He was moving around."

After the plaintiff had fallen, an ambulance was called and he was taken to the hospital.

In plaintiff's argument to the jury, his counsel told the jury " \* \* \* You have not heard one scintilla of evidence that this ladder of itself was defective. The ladder looks like it is and I don't doubt it is a good sturdy ladder \* \* \*."

From this occurrence and the injury resulting therefrom, plaintiff instituted this action seeking damages from the defendants in the sum of one hundred thousand dollars.

The defendants timely filed their answer denying generally all the allegations set out in the petition except that they were husband and wife and that Mrs. Sutton had engaged the appellant to do yard work and that while engaged in said labor, he did use one or more of the ladders and did sustain a fall. They further alleged that the risks of injury were assumed by the appellant and were caused or contributed to by his own negligence.

At the close of all of the evidence the defendants moved the court to direct a verdict in favor of the defendants and against the plaintiff for specified reasons, which motion was denied by the court and the cause was submitted to a jury for its determination. The court gave appellant's instruction No. 5, basing his recovery on the following grounds:

"Your verdict must be for plaintiff if you believe:

"First, defendants furnished and required plaintiff to use the aluminum extension ladder mentioned in evidence for the purpose and in the manner used by plaintiff, and

"Second, that ladder was not so constructed for it to be safely used by plain-

tiff for that purpose and in that manner, and

"Third, plaintiff used the ladder only after being assured by defendants it was safe for him to do so, and

"Fourth, defendants knew or by using ordinary care could have known that the ladder could not be safely used by plaintiff for that purpose and in that manner, and

"Fifth, defendants were thereby negligent and

"Sixth, while the ladder was being used for that purpose and in that manner plaintiff was damaged as a direct result of such negligence, unless you believe that plaintiff is not entitled to recover by reason of Instruction Number 7."

The jury returned a verdict in favor of the defendants, which was accepted by the court and judgment rendered in obedience thereof in favor of the defendants, from which plaintiff appeals.

■ Defendants have challenged the sufficiency of appellant's statement of facts in his brief. As a result we are faced immediately with the problem of plaintiff's failure to comply with Rule 83.05, V.A.M.R. Appellant's statement of facts certainly is not a "fair and concise statement of the facts without argument" as required by Rule 83.05, V.A.M.R. The statement of facts, consisting of six and one-half typewritten pages, omits the negligence of the defendants, the matter of the ladder slipping, or how the injury occurred except that he fell. It is the policy of this court to decide cases on the merits when reasonably possible. After an endless search through the transcript, ferreting out the facts and issues, and in order that justice may be done, we will reluctantly agree to decide this case on its merits, Martin v. O'Connor, Mo.Sup., 406 S.W.2d 41, 42 [2].

■ Plaintiff submitted his case by instruction No. 5. When this was done, he became bound by the issues raised and the evidence necessary to support his recovery under that instruction. Begley v. Connor, Mo.Sup., 361 S.W.2d 836, 839 [4–5].

■ Upon a consideration of the record, we are of the opinion that plaintiff did not establish his right to go to a jury on the question of fact as to whether the defendants were guilty of negligence as required by plaintiff's instruction No. 5. Brassfield v. Sears, Mo.Sup., 421 S.W.2d 321, 323 [1].

■ From the evidence it appears the ladder slipped and tipped over. The record is devoid of any evidence as to the ladder being defective or that the ladder was not constructed for it to be used by the plaintiff for the purposes and in the manner used by him as required by instruction No. 5. Plaintiff through his counsel argument admitted that the ladder was not defective. The burden was upon the plaintiff to establish his right to recover under instruction No. 5. This he failed to do. Nichols v. Bush, 291 Mich. 473, 289 N.W. 219, 221 [3]; Johnson v. Keen, Mo.App., 168 S.W. 2d 952 [1]. The slipping of the ladder which plaintiff as a household worker was using after he had tested it and moved it from place to place in the performance of his work cannot be held to be negligence of the defendants. Nichols v. Bush, supra; Johnson v. Keen, supra. " * * * An employer is not bound to warn and instruct an employee as to dangers that are obvious and patent. An employer has a right to assume in such a case that his servant will take reasonable precautions for his own safety and give reasonable attention to those matters that are open and obvious to the senses of a man of ordinary intelligence or which are as easily discernible by the employee as by the employer * * *" Johnson v. Keen, supra; Sjostedt v. Webster, 306 Mass. 344, 28 N.E.2d 239, 240 [3–4].

■ The aluminum ladder furnished by the defendants and used by the plaintiff is a simple tool. Steinhauser v. Spraul, 127

Mo. 541, 30 S.W. 102; Blundell v. William A. Miller Elevator Manufacturing Company, 189 Mo. 552, 88 S.W. 103, 105; Rule v. Giuglio, 304 Mich. 73, 7 N.W.2d 227, 229, annotation, 145 A.L.R. 542, and the plaintiff would be as well qualified as defendants to examine the ladder and to judge the danger of using it. Steinhauser v. Spraul, supra.

" '* * * A servant is presumed to possess, not only common sense, but certain knowledge peculiar to his trade * * *. Hence it is steadily held as sound law that the master may trust the servant to perform the intermediate, the ordinary and simple, duties incident to the servant's employment and resting upon the servant's knowledge and skill. * * * ' " Mosely v. Sum, 344 Mo. 969, 130 S.W.2d 465, 470 [6]. Where the circumstances are such that it is apparent from the servant's own evidence that the servant had very superior knowledge to the master and the servant relied on his own way, he cannot be said to have relied upon the master for assurance of safety. Mosely v. Sum, supra.

" * * * The appliance in question was a simple one. It required no more than ordinary knowledge for its use. It was sound. The only danger to plaintiff arose from the mode and manner of its use; and the mode and manner of using it, on the occasion in question, were within plaintiff's own control. She had used it with safety before, and undoubtedly knew as much about its use for such purpose as did the defendant. * * * Plaintiff cannot recover for an injury arising from the manner in which she saw fit to place the ladder in executing the order of defendant * * *." Steinhauser v. Spraul, supra, 30 S.W. at p. 103.

"Thus, where the things used in the work are not, in and of themselves, defective and are of the equivalent character and safety of those customarily used in that type of activity, where the servant is familiar with the work and has opportunity to inspect the premises and the appliances for himself and thus stands on equal footing with the employer in regard to knowledge, and where there are no hidden dangers, then the master is not ordinarily liable for an injury of the servant which results from a voluntary act of the servant in the use or misuse of such. * * *

"Ordinarily the duty to provide a safe place is not so strictly applied where the particular place of employment is not fixed and the risk involved therein is a transitory danger incident to the employment, where the risk arises out of some single or separate occurrence in the moving and shifting activities with which the employer is familiar, and where the master has had no superior opportunity to know and guard against the particular danger.

\* \* \* \* \* \*

"Where the employer only creates a condition which in and of itself and in the ordinary course is not a hazard and will not in and of itself cause injury, and the employee, having equal knowledge with the employer, intervenes with a distinct and separate act which he can reasonably foresee will combine with the condition to cause injury, and such intervening act is not at the direction of the employer and is not one reasonably to be expected of the employee in the normal course of his employment, then the original condition is only a remote cause and the act of the employee in intervening so as to cause the injury becomes the efficient proximate cause. * * * " McTurman v. Bell, Mo. App., 398 S.W.2d 465, 470 [10–12].

The evidence discloses no unusual circumstances or conditions, no latent, or hidden defects. Plaintiff had full knowledge of the existing conditions, he was not an inexperienced youth; but a grown man who held himself out and advertised that he was an experienced household worker and "because he had been doing this type work and up and down ladders all his life." The evidence in its best light

for plaintiff is insufficient to establish negligence on the part of the defendants.

There being no evidence to support the submission of plaintiff's claim as developed by direct evidence, it becomes necessary to consider whether the admissions against interest introduced by plaintiff are sufficient to permit plaintiff to submit his claim to the jury. " ' * * * Admissions against interest are those made by a party to the litigation or by one in privity with or identified in legal interest with such party, and admissible whether or not the declarant is available as a witness. * * * ' " Carpenter v. Davis, Mo.Sup. Banc, 435 S.W.2d 382, 384 [1–2]. Such is "admissible in evidence against such party where they are inconsistent with the claim he asserts in the action, whether he is the plaintiff or the defendant * * *." 29 Am.Jur.2d, Sec. 600, p. 655.

Plaintiff presented the following testimony, which was admitted without objection.

Plaintiff testified as follows:

"Q All right. Now then, did you have any other visitors that afternoon at the hospital? (Referring to the day of the accident.)

A Yes, I did.

Q Who was that? A Mrs. Sutton.

Q Do you have any idea what time of afternoon that was?

A It wasn't too long after Margaret came.

Q Was there any conversation at that time when Mrs. Sutton came in? A Yes, there was.

Q Who was present during the conversation?

A Margaret and Mrs. Sutton and another man next to me, in the next bed.

Q Did he participate in the discussion?

A No, he didn't, he was—no, he didn't.

Q All right, then who did participate in the discussion?

A Mrs. Sutton, Margaret, and myself.

Q Will you please tell the jury what was said by Mrs. Sutton and what was said to her by either you or Margaret at that time?

A Well, Mrs. Sutton came in the hospital room and Margaret was already there, and she asked me how I was feeling. I told her terrible, I was hurting all over, so she said, 'Well, I brought you a check for the day's work,' and she said, 'Well, John, I am so sorry that I insisted on you using that ladder.' She said, 'It was my fault. I shouldn't have never told you to knock it in anyway, the window in.' And then she looked at Margaret and she apologized to Margaret, too."

\* \* \* \* \* \*

Margaret Carter, the "girl friend" of plaintiff testified:

A Yes, he did, he had a visitor, Mrs. Sutton was there.

Q And were you there at that time?

A Yes, I was. I reached there first and she came in shortly after I got there.

Q And was there any conversation in your presence?

A Yes, there was. Mrs. Sutton said that, she said, 'Oh, Margaret, I am so sorry, I don't know what to do.' And she said, 'It's all my fault,' and she said, 'I should never have had him push that storm window in from that aluminum ladder.' She said, 'He wanted to use the wood ladder, but I insisted that he use the aluminum ladder,' and she said, 'I am very sorry,' she said, 'It's my fault.' And she was quite nervous and quite agitated and quite upset,

because she continued to pace the floor while she was there.

Q To whom were those remarks addressed?

A They were addressed to me."

* * * * * *

Mrs. Sutton testified:

"Q (By Mr. Beamer) Now, did you call Fronie Cox, the plaintiff's sister?

A Yes, I called her.

Q The day of the accident? A Yes.

Q And did you tell her what had happened to him?

A I told her that her brother had asked me to call her to tell her about the accident.

Q Did she make any remark?

A She was very surprised and said she couldn't understand how he could have fallen off a ladder, because he had been doing this type of work and up and down ladders all his life.

Q Did you say anything to Mrs. Cox about paying the hospital or the doctor bill?

A No, I did not."

* * * * * *

"Q Anyway, you were there, there was a conversation, you gave him the check, but you do not remember what was said. You were agitated, weren't you?

A I was."

Mrs. Fronie Cox and Mrs. Sutton testified they had a telephone conversation the day of the accident. Mrs. Cox testified she told Mrs. Sutton she didn't know how they would pay the hospital bill, and Mrs. Sutton said everything would be taken care of. Mrs. Sutton denied this, but on cross-examination admitted that she did not remember telling Mrs. Cox anything about the bill. Mrs. Cox and Mrs. Sutton testified about another telephone conversation they had the same evening. Mrs. Cox testified she called Mrs. Sutton about the hospital and plaintiff's care, and Mrs. Sutton told her to call back and talk to Dr. Sutton; that she called back, talked to him and he said he would take care of everything. Mrs. Sutton testified she did not remember the conversation but that Mrs. Cox may have called. Dr. Sutton did not testify.

■ It is clear that the "admissions against interest" introduced into evidence are cumulative. No question exists as to the furnishing of the ladder to the plaintiff or that defendant Mrs. Sutton may have insisted on plaintiff using the aluminum ladder or that it was "my fault in furnishing the aluminum ladder." Assuming that all the evidence was true, the probative force was that the aluminum ladder was furnished and that it was defendant Mrs. Sutton's fault in insisting that the aluminum ladder be used. Such admissions, which defendant Mrs. Sutton denied, are cumulative only to the direct testimony produced. They are not sufficient to make a submissible case for plaintiff.

■ One point remains for final determination, and that is the telephone conversation with Mrs. Fronie Cox concerning payment of the hospital bill and the later conversation with Dr. Sutton by telephone, that he would take care of everything, meaning the hospital expense. This also does not benefit plaintiff in making a case. Defendants' offer to provide plaintiff with payment of medical bills and such an admission against interest does not create a liability to the master for an injury. Spears v. Schantz, 241 Mo.App. 879, 246 S.W.2d 399, 409 [12]; Hughes v. Anchor Enterprises, 245 N.C. 131, 95 S.E.2d 577–579 [9].

■ There being no evidence to warrant the giving of instruction No. 5, the

capable and conscientious trial judge erred in denying defendants' motion for a directed verdict at the close of all of the evidence and submitting it to the jury for its determination.

As the plaintiff failed to make a submissible case, it is not necessary to pass on plaintiff's other allegation of error.

Judgment affirmed.

All of the Judges concur.