IMPKAMP, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

St. Louis Court of Appeals, December 13, 1904.

1. INSTRUCTION: Ground Covered. A trial court does not commit error in refusing an instruction upon a proposition fully covered by an instruction given.

2. STREET RAILWAYS: Expert Testimony: Hypothetical Question: Harmless Error. In an action for injuries received by a collision with a street car, a hypothetical question propounded to an expert carman testifying for plaintiff as to the time and space in which a street car may be stopped, without covering the exact condition of the track and equipment of the car in question, if erroneous, was non-prejudicial for the reason that the motorman running the car agreed with the witness within a few feet of the distance within which the car could be stopped.

3. ———: ———: ———: ———. The error was harmless for the further reason the evidence showed there was plenty of time and space within which to have stopped the car.

4. PERSONAL INJURIES: Practice: Instruction. In an action for personal injuries, including loss of earnings as an element of damage, where the petition alleged that plaintiff earned $5 a day, before he was injured, and he testified that he earned from $6 to $10 a day, it was error not to limit the recovery to $5 a day by instruction.

5. ———: Damages: Indefinite Evidence. And in such an action, evidence by the plaintiff that his earnings were from "ten dollars a day and eight and six," was too indefinite and uncertain and should have been stricken out.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Boyle, Priest & Lehmann* and *Geo. W. Easley* for appellant.

*Seneca N. & S. C. Taylor* for plaintiff.

(1) An electric street railway company operating dangerous machinery at a rapid speed in a populous city, is bound to know that pedestrians have an equal right to the use of streets; therefore it is the duty of the motorman to be on the lookout, and to take all reasonable measures to avoid injuring such persons passing along the tracks, and failure to do so is negligence. Presmeyer v. Transit Co., 102 Mo. App. 518, 77 S. W. 313; Twelkemeyer v. Transit Co., 102 Mo. 190, 76 S. W. 682; Kolb v. Transit Co., 102 Mo. App. 143, 76 S. W. 1050; Pope v. Railroad, 99 Mo. 405, 12 S. W. 891; Minter v. Railroad, 99 Mo. 517; Senn v. Railroad, 108 Mo. 142, 18 S. W. 1007; Henry v. Railroad, 113 Mo. 525, 21 S. W. 214; Sweeny v. Railroad, 150 Mo. 385, 51 S. W. 682; Klockenbrink v. Railroad, 172 Mo. 678, 72 S. W. 900; Schafstette v. Railroad, 175 Mo. 152, 74 S. W. 826; Riska v. Railroad, 180 Mo. 168. (2) When the motorman discovers a horse upon a railroad track drawing a vehicle, a short distance ahead of his car, it is his duty to have the power by which he propels the car under his control so as to avoid a collision, if by reasonable care he can do so, and failure of this duty is negligence. Degel v. Transit Co., 101 Mo. App. 56, 74 S. W. 156; Sepetowski v. Transit Co., 102 Mo. App. 110, 76 S. W. 696; Oates v. Railroad, 168 Mo. 544, 68 S. W. 906; Hutchinson v. Railroad, 88 Mo. App. 383; Grocery Co. v. Railroad, 89 Mo. App. 391.

STATEMENT.

The suit is to recover for damages to plaintiff's wagon and for physical injuries to himself caused by one of defendant's street cars colliding with the wagon. Plaintiff's evidence shows that he drove north on Leonard avenue in the city of St. Louis to Easton avenue. When he reached Easton avenue, plaintiff turned east and drove a short distance on the south side of defendant's railway track laid in the center of the street, when his wagon was obstructed by two or three wagons standing on the same side of the street between the track and the curb. In order to pass these wagons plaintiff pulled his team to the north a sufficient distance to put the north wheels of his wagon over the south rail of the track. Plaintiff testified that before turning in on the track he looked west and saw a car about two hundred feet away coming in his direction and whipped up his horse to a trot so as to pass the wagons and drive off the track to the south before the car should overtake him. When plaintiff had passed these wagons he pulled his team to the south and got the front wheel of his wagon clear of the track but before the hind wheel cleared the track the car struck it, breaking the wheel and axle of the wagon, and throwing him to the ground, causing severe injuries to his back and nervous system. His evidence shows that the car was running at a speed of from twelve to fifteen miles per hour and that there was nothing in the way to prevent the motorman from seeing him from the time he drove on the track until his wagon was struck by the car. The speed ordinance, limiting the speed of cars to ten miles per hour, and the vigilant watch ordinance of the city of St. Louis were offered in evidence by the plaintiff.

The motorman's narrative of the accident is as follows:

"Q. You were coming east—just state to the jury, as briefly as you can, but sufficiently at length to state the facts, how this accident occurred. A. I was coming east, and between Leonard and Compton there was a vehicle or two, before I got up against this fellow, near the track, and one, I believe, on the track, and I got them off and was running along down slowly and when I was about, well, say sixty feet, I suppose, from the fellow, he was driving along, and I kicked my gong, and he turned and looked back at me. I was running slow and he turned right back around in his seat and pulled his horse on the track, and that throwed me about thirty feet from him and maybe closer. I set my brake as soon as I could and reversed the car, and the car hit against this left hand front wheel and pushed the wagon over, and I suppose after I landed the wagon the car ran between five and six feet.

"Q. Do you mean you pushed the wagon over— overturned it? A. No, sir, slid it over the same as a man would slide it if he took hold and pushed it.

"Q. Are you sure you struck the front wheel of his wagon? A. Yes, sir; it was the rear part of the front wheel.

"Q. When he got on the track how far did you say you were away from him? A. Not over thirty feet, if I was that far.

"Q. How fast were you going prior to that time? A. About six miles an hour; in the neighborhood of that.

"Q. Was there anything you could do to stop the car; any means at hand or appliances at hand that you didn't use to stop the car when you saw that he was coming on the track? A. No, sir.

"Q. You used everything at hand, did you? A. Yes, sir."

He was corroborated in the main, by several disinterested witnesses produced by the defendant.

The court refused an instruction in the nature of

a demurrer to the evidence at the close of plaintiff's case and again at the close of all the evidence, and also refused the following instruction asked by defendant:

"The jurors are instructed that if you believe and find from the evidence that the negligence of the plaintiff contributed directly to his injuries, in whole or in part, you will find for the defendant, although you believe and find from the evidence that defendant's servants were also guilty of negligence."

The court gave the following instruction on the same subject:

"The jurors are instructed that negligence cannot be presumed but must be proved, and the burden of proof is upon the plaintiff to prove by the preponderance or greater weight of the evidence the facts necessary to a verdict in his favor under these instructions.

"And the jurors are further instructed that while the burden is upon the defendant to prove the contributory negligence of the plaintiff, yet it does not relieve the plaintiff from proving by the preponderance or greater weight of the evidence that his alleged injuries were caused, solely by the negligence of the defendant's servants charged. That burden remains upon the plaintiff throughout the entire case, and if the jurors believe and find from the evidence that plaintiff's alleged injuries were caused either by the negligence of the plaintiff himself, or by the combined and concurring negligence of the plaintiff and defendant's servants, or by an accident or misadventure for which neither party is responsible, then the plaintiff is not entitled to recover and your verdict must be for the defendant."

Under the instructions given, the jury found for plaintiff in the sum of $2,750, for which judgment was rendered. Defendant appealed.

BLAND, P. J. (after stating the facts).—1. The demurrer to the evidence is not worthy of discussion.

Plaintiff made out not only a prima facie case but a very strong one, so strong that no sane court would take it away from the jury.

2. The refused instruction in respect to contributory negligence was fully covered by the one given on the same subject for defendant. A thing once said, if well said, does not need repetition to give it emphasis, nor does a twice told proposition of law make the law more binding on the conscience of the jury.

3. An experienced carman was introduced by the plaintiff and, over the objection of the defendant, in answer to a hypothetical question, stated in what time and space a street car could be stopped. The question did not cover the exact condition of the street and track nor describe the equipment provided for stopping the car, and, technically speaking, was for this reason objectionable. But if there was any error in permitting the witness to answer the question, the error was non-prejudicial for the reason defendant's motorman testified that the car could have been stopped in from thirty-five to forty feet and that he stopped it within that distance. Plaintiff's expert testified the car could have been stopped in from thirty to thirty-five feet. The difference of five feet between the testimony of these two witnesses is too small to warrant a reversal of the judgment. In addition to this, plaintiff's evidence shows that he travelled eighty feet with two wheels of his wagon in the track and that the car travelled two hundred and eighty feet while he was in this position. This was certainly space enough to have allowed the motorman, who saw or could have seen plaintiff's wagon, if he had looked, time to have at least slackened the speed of the car and given plaintiff a minute's additional time in which to drive off the track.

4. In respect to his injuries and in answer to the question: "Tell how you were hurt," plaintiff said: "All over my leg, my breast and my knee and my toes and my back all over. I was hurt all over; I am not

well to-day yet.'' He further testified that after the injury he was confined to his house for over three weeks suffering all the time with his breast and neck, could not get his coat on and could not get up, and that he still felt ''bad all the time'' in his breast, head and side; that he was sixty-two years old at the time of his injury and was a contractor and builder and earned ''ten dollars a day and eight and six'' at his avocation. This evidence was objected to as uncertain and specu- lative and plaintiff was asked to restate his earnings. His answer was, ''Sometimes eight or ten dollars a day, or eight or six.'' The same objection was made by the defendant and overruled by the court and excep- tions saved. Plaintiff also testified that he could not work any more, that he had tried to work but the effort hurt him and after a little while he had to lie down; that he was nervous and his side hurt him and he had only earned one hundred dollars since his injury; that prior to the injury his health was good.

Dr. Grundmann, his attending physician, testified that he had known plaintiff about fifteen years and prior to his injury his health was fairly good. In re- spect to plaintiff's condition immediately after the in- jury, the doctor testified: ''When I came to him I found him lying on a lounge. I examined him and I found a sprained and bruised condition of the right shoulder. The left side was bruised—the right side, rather, was bruised. He complained about pains in the back, al- though there seemed to be not so much of a bruise, and pain in his hips, and especially the right one. The leg was somewhat bruised. He suffered a shock—a condi- tional shock, and he expectorated some blood. That is about the condition I found him in.'' The doctor fur- ther testified that he attributed the expectoration of blood to injury to the chest walls which likely pene- trated into the lung. The witness's examination pro- ceeded as follows:

''Q. State the extent to which you observed he

suffered from the shock and what part of his system was shocked? A. Mainly to the spinal cord and partly the brain, because the eyes had the peculiar look of a shock, somewhat dull and an expression of anguish due to pain.

"Q. Have you been treating him ever since he was hurt? A. Yes, sir.

"Q. State what his condition has been right along. Give a history of the case. Tell the jury. A. He was first confined a while.

"Q. Speak louder. A. And as soon as the bruises seemed to leave him and his shoulder got somewhat better, I ordered him out as soon as he could go; it was summer and I preferred to have him in the fresh air, and for a while, I believed it was for a few months, I can't state just how long, he seemed to get along very well, but later on I observed that his mind was not in the condition it had been. He is suffering from, sometimes call it dementia, or, rather, wakefulness, and sometimes his language is not clear, it is incoherent. I think he uses wrong words or expressions. The first time that I went with him to the bank—Jefferson bank —he had put his keys in his pocket; I believe he went in twice or three times and he didn't know where he had left them—couldn't find them.

"Judge Talty: I object to that as incompetent.

"Witness: Since that he has complained about pain mainly about his—

"Judge Talty: I object to that, about his complaining since then.

"The court: That may stand.

"To which ruling of the court, counsel for the defendant then and there duly excepted.

"Witness: He is exceedingly nervous; he is in a nervous state; he is different from what he was before.

"Q. Was he that way before he was hurt? A. No, sir.

"Q. State, in your judgment, whether the injuries such as you saw he had received from physical observation, were such as would produce pain? A. Yes, sir; he suffers pain.

"Q. Would it produce mental pain; also anxiety? A. Oh, mental anxiety; a shock always brings on anxiety, too.

"Q. What effect does a shock have on the human system? A. That depends on how severe it is.

"Q. What effect did it have on his system? A. It left him in a nervous state. He is not the man that he was.

"Q. Sir? A. He is not the man any more that he has been; it left him in a condition—it is hard to describe and give a definition of shock. These railroad shocks, they leave certain conditions—

"Objected to.

"The court: Confine yourself to this case.

"Witness: Well, he is in a state of weakness, and a weak back he has. He is nervous, and, as I stated before, his mental conditions are not as clear as they have been.

"Q. In your judgment, is he still suffering from those conditions you have described? A. Yes, sir; more or less at times; sometimes it is not so bad as at other times.

"Q. In all probability, in your judgment, how long will these conditions continue? A. How long?

"Q. Yes, sir; how long will he have those conditions? A. I don't think he will ever be cured from them."

Dr. Apperson, a witness for defendant, testified that plaintiff called at the office of Dr. Brokaw (surgeon of defendant Transit Company), with whom he was connected on May 14, 1903, and he made an examination of him, examined him all over, and found no evidence of injury except an abrasion of his left shin bone; that plaintiff said his shoulder, side, head

and wrist had been bruised but there was no sign of such injury when he examined him.

The petition alleged, ''That plaintiff's avocation was that of a carpenter and builder and before his said injuries he was able to earn and did earn at least five dollars per day, and that in consequence of such injuries he was laid up for a month, unable to work, and that ever since said injuries he has not been able to work and earn money as he was able to do in the past.'' It is nowhere stated in the petition that plaintiff was a contractor and builder, nor is it alleged that his daily earnings exceeded five dollars per day. In respect to the measure of damages the jury was instructed to allow such sum ''as will equal the loss of earnings, if any, plaintiff has sustained directly resulting from his said injuries, and for such loss of earnings in the future, if any, as plaintiff will in all reasonable probability sustain on account of his said injuries.'' The petition alleged that plaintiff's loss (if totally disabled) was five dollars per day. His evidence was that his loss was not less than six dollars per day, ranging from that to eight and ten dollars per day. The proof of loss of earnings, if it can be called proof, exceeded what plaintiff alleged such loss to be, yet the jury was not limited to the amount of loss of earnings alleged in the petition but was directed to find the loss at such sum as the evidence showed it to be. The sum, if proved at all, ranged from one to five dollars per day in excess of what the petition alleged. If plaintiff desired to recover a larger amount of damages on this score than he claimed in his petition, he should have amended his petition to conform to his evidence; having failed to amend his petition, his instruction should not have allowed a recovery for loss of earnings exceeding the amount alleged in his petition. Rumsey v. Railway, 144 Mo. l. c. 189, 46 S. W. 144; Paddock v. Lance, 94 Mo. 283, 6 S. W. 241; Ramsey v. Henderson, 91 Mo. 560, 4 S. W. 408. We think that plaintiff's evidence in re-

spect to his loss of earnings was' too indefinite and uncertain to afford the jury a reasonable basis upon which to estimate this item of damages and that his answer that his earnings were from "ten dollars a day and eight and six" should have been stricken out and the witness required to give more certain and definite evidence in regard to his loss of earnings.

The judgment is reversed and the cause remanded. All concur.