Helen F. BEGLEY, Appellant,

v.

James H. CONNOR, Jr., and John E. Housh, Respondents.

No. 48691.

Supreme Court of Missouri,

Division No. 2.

Nov. 14, 1962.

Milton R. Fox, William R. Kirby, St. Louis, for appellant.

Derrick & Holderle, St. Louis, for respondent James J. O'Connor, Jr.

Evans & Dixon, Eugene K. Buckley, St. Louis, for respondent John E. Housh.

BOHLING, Commissioner.

Helen F. Begley instituted this action for $50,000 damages against James H. Connor, Jr., and John E. Housh for severe personal injuries sustained in a multiple automobile collision. Plaintiff appeals from the judgment entered upon a unanimous jury verdict for defendants and contends the court erred in rulings with respect to certain evidence and the giving of an instruction on behalf of defendant Connor. Each defendant contends plaintiff failed to make a submissible case against him, and that the trial court committed no reversible error.

The collisions occurred about 2:30 p. m. Sunday, August 16, 1959, on Highway 61–67 at its intersection with Oak Street in Festus, Missouri. Highway 61–67 extends generally north and south and has two southbound and two northbound lanes, with, at the scene involved, a center concrete divider strip, four feet wide and a few inches high, with openings for the passage of traffic. The asphaltic concrete with limestone aggregate pavement on either side of the divider strip was 24½ feet wide and the shoulders were nine feet wide. There is a crown of a "little rise" in the highway and then a slight down grade for southbound traffic approaching the place of the collisions. The Oak Street opening is 124 feet long and affords access to, among other things, an eating place known as the Dairy Queen just west of the highway. A consulting engineer, plaintiff's witness, estimated the distance north from the south end of said opening to the crest of the rise, as we read his testimony, to be about 372 feet, but on cross-examination he admitted his measurements had not included all the distance involved. Plaintiff's brief puts this distance at 510 or 520 feet. Defendant Connor's estimate was between 750 and 1,000 feet.

A summary, notwithstanding some repetition later, may be helpful. Four automobiles were involved. Plaintiff was a passenger on the front seat of her brother Arthur Hettenbach's Chevrolet carryall, southbound in the inside lane, next to the divider strip. Her son Thomas and his friends Patricia and Larry Ryan occupied the other seat. Defendant Housh, his wife and two daughters, of Indianapolis, Indiana, were southbound in the outside lane in his new Pontiac station wagon, at distances variously estimated at two car lengths and 150 feet behind the carryall. Defendant Connor, northbound in his Edsel sedan, intended to stop at the Dairy Queen. He was either stopped at an angle with most of his

Edsel in the 4 foot width of this Oak Street opening or was angling toward the opening and slowing down to permit the approaching southbound traffic to pass. Connor's Edsel suddenly shot out in front of the carryall when the carryall was one or two car lengths north of it. The carryall and Edsel collided and both went westwardly into the outside southbound lane. Housh braked and swerved his Pontiac but a second collision occurred; i. e., the Pontiac and the carryall collided. Mrs. Macle Davidson at said time was northbound in the outside lane in a Chevrolet. She turned into the inside lane to pass a car immediately ahead of her and her car struck the Edsel and knocked it into the southbound lanes. Mrs. Davidson was not a party to this suit.

Plaintiff's case against defendant Connor rests upon the testimony of her brother; and her case against defendant Housh rests upon the testimony of her son.

After stopping for ice about a half mile or more north of the electric traffic signal at the Festus-Crystal City junction, Mr. Hettenbach drove his carryall in the southbound inside lane, next to the divider strip, up to the point of the collisions, stopping, however, for a then red electric signal at said junction. It had been raining hard, and was still raining. The pavement was wet. Hettenbach's maximum speed was 30 to 35 m. p. h. He was just over the "little rise" in the highway when he first saw Connor's northbound Edsel, and "guessed" the Edsel was "something like" two blocks or "was about a block" and "I was about a block" from where the accident occurred. He testified in chief that he didn't pay any attention to the Edsel until the carryall came "to the break in the divider" and the Edsel "started to angle toward my side of the road and seemed to slow down and looked like he was going to let me pass until we got almost on top of each other and then he came right out in front of me." On cross-examination he stated the Edsel, with its wheels in the opening in the divider strip, was at about a thirty degree angle, like it was "slowing down—stopping to let me

get by." He concluded the Edsel was going to stop and let the carryall maintain its speed of 30 m. p. h. and pass. He stated at different times that the carryall was less than a car's length or was about two car lengths from the Edsel when the Edsel entered the carryall's lane, and that it happened too fast to do anything; he "believed" he applied his brakes.

Asked, on cross-examination: "Q You mean to say this car just drove gradually out in front of you? A No. I wouldn't say it drove gradually out in front of me. Q How did it come out? A Well, like the man's foot slipped off the brake and hit the accelerator. Q You mean, shot right out in front of you? A That's right. Q Just like a cannon ball? A Something like that. Q You saw him slowing down? A That's right. Q And he had come almost to a stop? A Well, he hadn't stopped, almost to a stop. Yes, he slowed down enough I figured he was going to let me pass. Q And all of a sudden when you got two or three car lengths away from him, the car shot right out into that lane, didn't it? A Yes. Q Just as if something hit it and knocked it out there, wasn't it? A Either that or he pushed down on the accelerator. Q It could have been one or the other, couldn't it? A It could have."

The cars collided at the right headlights of the Edsel and the left headlights of the carryall.

Hettenbach knew nothing about Housh's Pontiac's collision with the carryall.

Some additional testimony of Hettenbach appears later.

Defendant Connor testified: He moved his Edsel sedan from the outside to the inside northbound lane and signaled his intention to turn left to stop at the Dairy Queen. The highway becomes slick when wet. He slackened speed, saw southbound cars approaching, and stopped in the south 20 feet of the opening. He guessed, estimated, he was stopped about 30 seconds.

Looking in his rear view mirror he saw a car within 15 or 20 feet of him, then felt a terrific impact, which knocked the Edsel into the southbound lanes, and got a glimpse of a woman, later ascertained to be Mrs. Macle Davidson, driving a Chevrolet and passing him.

Mrs. Macle Davidson testified she was traveling 40 m. p. h., with her two minor children in the rear seat, and turned into the inside northbound lane to pass a car immediately ahead of her in the outside lane. She was not over two car lengths from the Edsel when she first saw it, stopped or going very slowly, with about 2 feet of the rear end in her lane. "I was upon him before I knew it and I hit him before I looked." Her Chevrolet struck the Edsel and knocked it into the southbound traffic lanes.

The Davidson car was damaged at its left front bumper, hood, fender and wheel and the Edsel at its right rear end by this collision.

■ Here, as stated, plaintiff relies upon witness Hettenbach to establish the liability of defendant Connor. In such circumstances where plaintiff's evidence shows the injury may have resulted from one of two causes, one of which would justify a verdict for the plaintiff and the other not, and, "as between the two possible causes, the evidence leaves the proximate cause of the injury to speculation and conjecture, plaintiff's case must fail." State ex rel. City of St. Charles v. Haid, Banc, 325 Mo. 107, 28 S.W.2d 97, 102 [5]. "[W]hen the plaintiff's own evidence, or evidence which he does not dispute, shows the casualty may have resulted from either of two or more causes, for only one of which the defendant would be liable, it has been held many times the burden is on the plaintiff to show the cause for which defendant was responsible produced the result." Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S. W.2d 125, 130 [8]. See also Corder v. Pruitt, Mo., 361 S.W.2d 659 of even date herewith; Adelsberger v. Sheehy, 332 Mo. 954,

59 S.W.2d 644, 647 [6]; Pietraschke v. Pollnow, Mo.App., 147 S.W.2d 167, 170 [5].

■ The rule entitling a plaintiff to the most favorable view of the evidence does not authorize courts to supply missing evidence (Nance v. Atchison, T. & S. F. Ry. Co., 360 Mo. 980, 232 S.W.2d 547, 552 [4]) or " 'to disregard the dictates of common reason and to accept as correct or true that which obviously, under all the circumstances in evidence, cannot be correct or true, nor does it require us to give plaintiff the benefit of any other than reasonable inferences.' " Wilkins v. Allied Stores of Missouri, Mo., 308 S.W.2d 623, 629 [4].

■ Plaintiff's verdict-directing instruction predicated a verdict against defendant Connor on the theory said defendant, northbound on said highway, "did turn his" Edsel "to the left and across the center line of said highway" and "into the path" of Hettenbach's southbound carryall "without stopping his said automobile before said turn" and at said time and place said carryall "was in such close proximity to said" Edsel "that it was not reasonably safe to make said left turn," and that such was negligence on the part of said defendant and proximately caused plaintiff's injuries. The submissibility of plaintiff's case is to be ruled on the issue or issues upon which it was submitted to the jury. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91 [1, 4, 5].

Hettenbach stated that he heard four cars, one the Davidson Chevrolet, were involved in the collision; that on the evening of the collisions he went to the garage and saw all of the cars involved except one, the Davidson car, which had been removed; that his purpose at the time was to see the four cars involved, and that he saw the Edsel and it was damaged "back there," referring to defendant Connor's exhibits which show the Edsel was damaged at its right rear bumper and end.

Hettenbach testified he watched the Edsel closely enough to tell there was no arm or

other signal for a left turn when the Edsel "started to angle into my lane," and that he did not see the Davidson car. Asked whether he saw any other northbound traffic even with or near the Edsel as it was approaching this cutover prior to the time of impact, he answered: "Well, I don't know if it was at the time of the impact. No, I don't remember seeing any traffic there. Q I mean, prior to the time? A Prior to the time, I was more or less concentrated on whether he was going on in front of me or not. I wasn't expanding my view that far." From this we understand the witness was not expanding his view far enough to actually know whether there was or was not any northbound traffic near the Edsel immediately prior to its collision with the carryall.

Under Hettenbach's testimony and actions no danger existed in the condition brought about by Connor slowing the speed of his Edsel in the act of "stopping to let me [Hettenbach] get by." The danger was created and the collision resulted when the Edsel suddenly shot out like a cannon ball as if Connor's foot slipped off the brake and hit the accelerator or as if something hit the Edsel and knocked it out in front of the carryall. Hettenbach's testimony under the cases last cited that it could have been one or the other did not remove Connor's liability under plaintiff's verdict-directing instruction from speculation and conjecture; that is, whether the proximate cause of plaintiff's injuries was Connor's foot slipping off the brake and hitting the accelerator or the Davidson car hitting the Edsel and knocking it out in front of the carryall. Consult Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 246 [4–6]; King v. Ellis, Mo., 359 S.W.2d 685, 688 [4, 5].

Our ruling that plaintiff failed to make a submissible case against defendant Connor results in any error in Connor's sole cause instruction being without prejudice to plaintiff. Bunch v. Mueller, 365 Mo. 494, 284 S.W.2d 440 [2]; Brooks v. Stewart, Mo., 335 S.W.2d 104 [2], 81 A.L.R.2d 508.

The court admitted Connor's cross-examination of each passenger in the carryall, plaintiff's witnesses, as to when he or she heard about the Davidson Chevrolet being involved in the collisions, and Mr. Davidson's testimony that he told plaintiff's husband on the evening of the collisions that Mrs. Davidson was driving the car that struck the Edsel and caused the collisions. Plaintiff objected, claiming mainly the testimony was hearsay. This testimony tended to establish Connor's defense. It need not be detailed.

Whether plaintiff made a submissible case is a question of law for the court; and rulings admitting testimony, although incompetent, tending to support a defendant's defense do not prejudice a plaintiff who has failed to make a submissible case against said defendant. Howard v. Johnoff Restaurant Co., Mo., 312 S.W.2d 55, 56 [1]; Gilbert v. Bluhm, Mo., 291 S.W.2d 125, 126 [2], 58 A.L.R.2d 1164.

On this appeal the claimed errors, relating to liability, do not affect the defendants jointly and the rights of plaintiff against one defendant do not affect plaintiff's rights against the other defendant. Nix v. Gulf, M. & O. R. Co., 362 Mo. 187, 240 S.W.2d 709 [1]; Grether v. Di Franco, Mo.App., 178 S.W.2d 469 [15, 16]; Rose v. Knobelock, Mo.App., 194 S.W.2d 943 [10]; Civil Rule 83.13(b, c), V.A.M.R.

Plaintiff read portions of a deposition of defendant Housh to sustain her claim against him. He had purchased a new 1959 Pontiac station wagon, equipped with power brakes, about 30 days before the collisions, and had driven it about 1,000 miles. He estimated he first noticed the carryall two or three miles north of the collisions. He remembered passing through an intersection having an electric signal before he noticed the carryall, which was then about 100 yards ahead of him. (Apparently he was not referring to the Festus-Crystal City junction intersection signal.) The speed of the Pontiac was, "roughly," about 30 m. p. h.

Thomas Begley was 18 years old at the time of trial. He testified: He was crouched back of the carryall's second seat shipping ice to fill the soda cooler. While the carryall was stopped in the southbound inside lane, with a couple of cars ahead of it, at the Festus-Crystal City junction, he noticed a late model Pontiac (he did not know its color or body style) which he estimated was 150 feet north of the carryall and "was still coming" in the outside southbound lane. He thought it was not quite a mile to where the collisions occurred. When the light changed "cars started going around us, passing us up and they were all ahead of us." The second and last time he noticed the Pontiac, it was just coming over the "slight slope" in the highway and was the same distance to the rear of the carryall. He stated some soda bottles started sliding to the front when the carryall passed over this rise and he went to pick them up; "that's when I first noticed the car," and he started putting the soda bottles back. He was not able to state how far the carryall or the Pontiac was from the point of collision when he saw the Pontiac the second time. He did not know where the Pontiac was when the first impact occurred. "Not too shortly" after he saw the Pontiac the second time, the first impact occurred, threw him forward, tore the seat up and when he started to get up the second impact occurred.

■ Plaintiff's expert witness on stopping distance made a study of the area involved on the Sunday preceding the trial; that is, some fifteen months after the collisions. Plaintiff testified that when they got on the highway out of St. Louis it started raining and was raining very hard at first. Hettenbach testified it started to rain when they got on the highway and was raining enough they had to use the windshield wipers. Lawrence Ryan, plaintiff's witness, testified the carryall felt like it was "sliding" after the first impact. Much space is devoted in the briefs on plaintiff's appeal from the judgment in Housh's favor to the court's rulings as to whether plaintiff's ex-

pert witness, assuming "it was raining at the time, the pavement was wet, * * * and the streets were wet and it was misting enough they had to have the windshield wipers on," could give "the shortest stopping distance" for a 1959 station wagon, with 1,000 miles on it and traveling 30 m. p. h., "with safety to the people in it and other people on the street." The witness answered "Yes" to the question. Objections were then interposed and sustained but the answer was not stricken. Thereafter, the question in substance, so far as material to the discussion, was renewed and upon objections being sustained, offers of proof were made that the Housh automobile could be stopped in 117 feet with safety, which, upon objections, were also denied.

The parties agree that trial courts exercise a wide discretion in the admission and exclusion of expert testimony "and the exercise of that discretion will not be interfered with unless it plainly appears that such has been abused." Superior Ice & Coal Co. v. Belger Cartage Service, Inc., Mo., 337 S.W.2d 897, 906 [8]; Yocum v. Kansas City Pub. Serv. Co., Mo., 349 S.W. 2d 860, 864 [1] (cited by plaintiff).

Among the objections interposed and renewed here by defendant Housh was that "the amount of wetness on the highway" was missing from the questions and offers of proof.

Asked on direct examination whether "asphalt pavement and being wet and raining" would be "one of the factors" to be considered in arriving at the stopping distance, plaintiff's expert witness answered: "Yes. It's one of the factors. Probably in this case, the more important factor in my opinion." That portion of the answer following the word "factors" was stricken on objection by defendants that it was not responsive. He stated that wetness on the pavement lengthens "the stopping distance, depending on the speed of the vehicle"; that how much water was on an asphalt pavement enters to a degree in determining the stopping distance, and the fact that precipi-

**842**

tation is falling on the pavement would qualify his answer.

The trial court pointed out that plaintiff's questions assumed the surface of the highway was in a comparable condition "last Sunday, except for dampness as on August 16, 1959," fifteen months earlier, when there had been no testimony establishing that fact. Plaintiff's expert could not determine from photographs admitted in evidence that the surface of the highway was the same when he observed it as when said exhibits were taken—a few days after the collisions. The court considered said fact issue not a matter for expert testimony and to permit it to be established by a witness who had observed the highway only the Sunday before the trial would rest in speculation.

In Anderson v. Prugh, 364 Mo. 557, 264 S.W.2d 358, 362 [1], testimony of an expert witness, who was not an eyewitness, as to the maximum speed of a sled on a hill of packed snow and ice was considered improperly admitted as the speed of the sled would vary with the slickness of the snow and ice from hour to hour and other factors and there was no particular testimony introduced respecting the factors involved. Consult Burge v. Wabash R. Co., 244 Mo. 76, 148 S.W. 925, 931 [5] (where among other things, there was no evidence as to the grade or the condition of the track at the time); Impkamp v. St. Louis Transit Co., 108 Mo.App. 655, 84 S.W. 119, 121(3) (stating a question was "technically objectionable" which "did not cover the exact condition of the street and track, nor describe the equipment provided for stopping the car").

In this case plaintiff's expert witness stated that wetness on the asphalt pavement would lengthen the stopping distance, and that the amount of water on the pavement was a factor he would consider in estimating the stopping distance. We think plaintiff could have cleared up the factors which gave the court concern; that it is not established the court abused its discretion,

and we are not disposed to interfere with its rulings in the circumstances of this record. The issue does not reach whether the admission of the testimony would have constituted error.

The questions and the offers of proof above ruled involved only defendant Housh's duty and ability to stop under the humanitarian doctrine. He contends plaintiff failed to make a humanitarian case on his duty to stop.

We have stated most of Thomas Begley's testimony on the issue.

Mr. Housh testified he was southbound in the outside lane and noticed the carryall in the inside lane, about 100 to 150 feet ahead of him, maybe a mile before the collisions. The speed of the Pontiac increased or that of the carryall slackened, and by the time the two cars were a city block north of the collisions, the Pontiac had moved to within something like two car lengths of the carryall. These cars held their respective positions, traveling about 30 m. p. h., up to the impact between the carryall and Edsel. The first he knew of anything unusual was when he heard an impact and the carryall sort of rocked or bounced toward the outside lane. Housh applied his brakes hard and swerved to the right as far as he could, and the carryall "come around to me" when the Pontiac was moving about 10 m. p. h. The carryall was between him and the opening and he did not see the Edsel before hearing the impact but then saw it south of and against the carryall moving westwardly. The right front of the carryall, where the bumper fastens on, struck the left front wheel of the Pontiac. Both cars were moving when they collided in the outside southbound lane.

Photographs, admitted without objection, showing the cars after the collision and before being moved are to be the following effect: The Pontiac was at an angle slightly west of south, practically along the west edge of the pavement with its fender dented above its left front wheel. The carryall

was crosswise of the southbound lanes, at a slight angle south of west, with about one-third of the front door and the front end in the outside southbound lane and with no damage showing on its right front fender and side. The Edsel was practically crosswise of the southbound lanes, with its damaged front bumper at or extending just beyond the west edge of the pavement.

Plaintiff was in no imminent peril so long as the carryall maintained its southbound course in the inside lane and the Pontiac maintained its course in the outside lane of this highway and a position of imminent peril within the humanitarian doctrine did not arise prior to when the carryall, after the collision with the Edsel, began to move toward the outside lane and the path of Housh's automobile. Yarrington v. Lininger, Mo., 327 S.W.2d 104, 111 [11]; Ornder v. Childers, Mo., 327 S.W.2d 913, 917 [4]. Thomas Begley was not able to state where the Pontiac was when the first impact (the collision between the Edsel and the carryall) occurred, and this testimony of his did not establish that Housh had 117 feet (the shortest stopping distance with safety stated in plaintiff's offers of proof) in which to stop after the carryall started its movement toward the lane in which the Pontiac was traveling.

Thomas Begley, asked on direct examination to give the time element between the first and second impacts, stated: "It seemed like hours, but I guess it was three or four seconds"; and then, at the suggestion of plaintiff's counsel, stated that was his best estimate. When asked on cross-examination if it was not "a minute or a minute and a half before the accident" when he saw the Pontiac the second time, he stated: "No, I don't think so." "A minute is a long time, and it didn't seem that long." His attention was then called to a deposition he had given the Friday before wherein he stated his best estimate of the time elapsing between when he saw the Pontiac the sec-

ond time and the collisions was a minute or a minute and a half; and he then testified at the trial: "Q That's your best estimate? Minute or minute and a half? A Yes."

The "rise" in the highway was 510 or 520 feet, according to plaintiff, from the point of the collisions, and the automobiles were moving about 30 m. p. h., or 44 feet a second. It is at once apparent that Thomas Begley's "best estimate" that the time element between when he saw the Pontiac the second time at said rise and the collisions was a "minute or minute and a half" is so contrary to physical laws and facts of universal knowledge as to have no probative value. Stonefield v. Flynn, Mo.App., 347 S.W.2d 472, 477 [5, 8], applying Kelly v. Terminal Rd. Ass'n, Mo., 315 S.W.2d 699, 702 [1, 2]. His testimony that the time element between the first and second impacts "seemed like hours, but I guess it was three or four seconds" is to be and when taken with his above-discussed testimony becomes confusing and, as he stated, was a "guess" and not substantial probative evidence upon which to establish liability. Stonefield v. Flynn, supra. We conclude there was no substantial probative evidence, rising above speculation and conjecture, that when plaintiff came into a position of imminent peril of a collision between the carryall and the Pontiac defendant Housh then had 117 feet in which to stop and avoid such collision

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.