**TRI–STATE MOTOR TRANSIT COMPANY, Respondent,**

v.

**NAVAJO FREIGHT LINES, INC., Appellant.**

No. 26619.

Missouri Court of Appeals, Kansas City District.

Sept. 2, 1975.

Motion for Rehearing and/or Transfer Denied Oct. 6, 1975.

Application to Transfer Denied Nov. 10, 1975.

Lee E. Wells, McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, for appellant.

John R. Cleary, Albert Thomson, Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal by Navajo Freight Lines, Inc., from judgment for Tri-State Motor Transit Company against Navajo for $160,258.26 damages on Tri-State's petition, and against Navajo on its counterclaim for $203,088.67 damages.

Count I[1] of plaintiff's petition alleged: that on March 7, 1960, plaintiff Tri-State and defendant Navajo entered into a trailer interchange contract whereby they agreed to exchange trailers on a trailer-for-trailer exchange basis; that Tri-State has in its possession sixteen of Navajo's trailers, identified by number, which it received and acquired as a result of trailer-for-trailer exchanges with Navajo under the interchange contract; that under the agreement Tri-State is entitled to the use of such trailers; that Navajo has failed and refused to tender to Tri-State delivery of trailers in exchange for the designated trailers, and Tri-State is therefore, under the exchange agreement, entitled to continued use of the designated trailers; that Navajo has allowed the state licenses on such trailers to expire and has wrongfully refused to relicense the trailers in order to deprive Tri-

---

1. All counts are identified as they were renumbered at time of submission of the case.

State of their use; that as a result Tri-State has been deprived of the use of the designated trailers, has lost income and revenue, and is entitled to recover compensation from defendant. Plaintiff's prayer on Count I was for $150,000.00.

Count II of plaintiff's petition alleged: that during the period September 16, 1968, through October 15, 1968, Tri-State, at the request and instance of Navajo, acted as a participating carrier with Navajo in freight transportation; that Navajo received revenue for freight transportation in which Tri-State acted as Navajo's participating carrier and has not paid Tri-State its share of the revenue although Tri-State has made demand of Navajo for such payment. Plaintiff's prayer on Count II was for $13,-518.26.

Defendant's answer to plaintiff's petition admitted the contract in 1960 "wherein plaintiff and defendant agreed to exchange trailers"; it was otherwise a general denial.

Count I of defendant's counterclaim alleged: that on October 10, 1968, Tri-State canceled the contract and is indebted to Navajo under the contract for use of Navajo's trailers since termination of the contract, for which payment has been demanded by Navajo and refused by Tri-State. Defendant's prayer on Count I was for $163,040.00.

Count II of defendant's counterclaim alleged: that on or about April 11, 1968, pursuant to agreement with Tri-State as participating carrier in freight transportation, Tri-State received revenue for freight transportation in which Navajo acted as a participating carrier and Tri-State has failed and refused to pay Navajo its share of such revenue although Navajo has made demand for payment. Defendant's prayer on Count II was for $3,833.67.

Count III of defendant's counterclaim alleged: that Tri-State has in its possession sixteen trailers, as designated in its petition, belonging to Navajo, which Tri-State has failed and refused to return to Navajo although Navajo has made repeated demand for their return; that the value of such trailers is $45,000.00. Defendant's prayer on Count III was for $45,000.00.

Plaintiff's answer to defendant's counterclaim was essentially a general denial; and, by way of reply, Tri-State quoted paragraph 4.4 of the trailer interchange contract, viz:

"A carrier acquiring use of a trailer from another on an exchange basis shall not be required to redeliver it to the carrier from whom received until such other carrier tenders redelivery of the trailer for which it was exchanged, and during the time in which it is ready, able and willing to redeliver such trailer for exchange but cannot do so because the other carrier is not able to return its exchanged trailer, it shall not be in default nor required to pay compensation for delay in returning such trailer";

and alleged: that Navajo's sixteen designated trailers in Tri-State's possession were acquired on an exchange-only basis with Navajo; that Navajo has not tendered redelivery to Tri-State of trailers it received in exchange, or trailers in lieu thereof; that Tri-State, under the agreement, is not required to redeliver to Navajo the trailers in its possession, and is entitled to use such trailers without paying compensation until Navajo tenders to Tri-State redelivery of the trailers (or their equivalents) it received in exchange for said trailers.

Defendant's opening statement contained the following recitals and admissions:

As to plaintiff's Count I, "that before the trailer interchange agreement was canceled, * * * Tri-State ended up with 16 of Navajo's trailers * * *. Now * * in some instances they did indeed give up a trailer at the time they received the Navajo trailer * * *. Normally it's on a trailer-for-trailer exchange basis. You give the trailer, you interline, is what they call it, to another company and you get one back on a trailer-for-trailer exchange basis. * * * $10.00 per day * * * is the cost to rent

a 40-foot trailer such as those that are involved in this particular instance * *."

And as to plaintiff's Count II, "We are not arguing that the revenue may well be owed to Tri-State in the sum of $13,000.00 but our argument is that Navajo is entitled to the $3800.00 approximately credit in connection with that revenue * * *."

The Trailer Interchange Contract was in evidence as plaintiff's Exhibit 1. It is a form contract used in the trucking industry; and, as between Tri-State and Navajo, it was executed March 7, 1960. In addition to provisions of the contract mentioned in the pleadings, particular references were made to paragraph 4.1, viz:

"Interchange may be made on a trailer-for trailer exchange only as may be shown on the Trailer Interchange Receipt and Inspection Report * * *";

to an addition to paragraph 5.5, viz:

"Trailer For Trailer Basis Only";

and to paragraphs 1, 2, and 7, viz:

"1. The undersigned carriers enter into this agreement governing their relationship with respect to interchange of trailers, and to make this agreement operative respecting interchange of individual trailers will cause to be executed the Trailer Interchange Receipt and Inspection Reports hereinafter mentioned; provided, however, that no provision in this contract shall be construed to increase the legal liability of any party hereto. The term trailer as used herein shall refer to any load-carrying vehicle without power."

"2. At the time of interchange an authorized representative of each carrier shall execute, in multiple copies as the carriers may require, a counterpart of the Trailer Interchange Receipt and Inspection Report attached hereto and made a part hereof. The Parties shall be bound by the notations on the Trailer Interchange Receipt and Inspection Report."

"7. THIS AGREEMENT and said Trailer Interchange Receipt and Inspection Report shall constitute the entire agreement between the parties and no verbal amendment or modification thereof shall be permitted. This agreement may be supplemented or amended only by a written agreement."

Clarence Richard Berry was an employee of Tri-State at its office in Joplin, Missouri. Tri-State also operates trailers under the names of Hughes, Park Hill, U.S.A.C., and DeTar. Mr. Berry kept the permanent records of Tri-State's trailer interchanges between Tri-State and other companies. He defined a trailer interchange as a "swap of trailers," and stated that Tri-State exchanged trailers with other companies on a uniform trailer-for-trailer basis which means that if Tri-State gave any other company a trailer, Tri-State would expect a trailer in return; if the other company initiated the exchange and gave Tri-State a trailer, the other company would expect to get a trailer in return. Some companies interchange trailers on a per diem basis where a charge is made rather than giving a trailer in exchange. Tri-State, but for a single exception, did not operate on the per diem basis.

Mr. Berry's permanent record of trailer interchanges between Tri-State and other companies was by a "card record whereby any particular trailer we can show receiving from another company, what trailer we gave them for it, or what trailer we gave to another company, what trailer we received for it." He prepared and kept such records himself. When Tri-State and Navajo interchanged trailers between themselves, neither required the other to deliver a specific trailer in exchange for a trailer from the other. Tri-State had in its possession sixteen Navajo trailers, Nos. 1119, 1136, 1145, 1246, 1251, 1295, 1325, 1369, 1431, 1442, 1450, 1472, 2023, 2123, 2228, and 7011. Exhibits 3 through 31 were Tri-State's permanent record cards respecting the record of the foregoing Navajo trailers and trailers exchanged by Tri-State for such trailers.

Mr. Berry prepared each of the records in the regular course of Tri-State's business. He made entries on the card on or near the date shown for the entries, and he kept the records under his supervision and control. Over objection that the information recorded was based on other documents or sources not now available and, as such, hearsay and a secondary record, the exhibits were received as business records, the court observing that the objection went to the weight or credibility of the records as evidence rather than their admissibility as business records.

The information used to compile the records came via telephone memoranda, Telex messages, and interchange receipts. Most of such sources were not kept after the card record entry was made because the card became the permanent record. Mr. Berry did provide defendant with some 1900 interchange receipts from which information they contained had been transferred to the card record. By reference to his business records, Mr. Berry gave the date upon which each of the Navajo trailers in issue came into possession of Tri-State, the point where the interchange took place, and the trailer given Navajo by Tri-State in exchange for the designated Navajo trailer.

Mr. Berry stated that Tri-State was willing to deliver the sixteen Navajo trailers to Navajo "on an exchange of trailers, a trailer-for-trailer basis, the same way we received them. * * * if we just automatically gave them the sixteen trailers back and didn't receive one, we would be sixteen trailers short."

Beginning in January, 1969, Navajo quit furnishing license plates for the sixteen Navajo trailers in possession of Tri-State. By use of a per diem charge of $10 per day, excluding Saturdays, Sundays, holidays, and the first two days of interchange, all as per custom in the trucking business, Mr. Berry computed a total of 14,674 days upon which Tri-State lost the use of the sixteen Navajo trailers for want of license plates. The damage thus calculated was $146,-740.00.

Cross-examination of Mr. Berry adduced that the trailer interchange contract between Tri-State and Navajo was canceled October 10, 1968, and that the sixteen Navajo trailers were then in possession of Tri-State. During the term of the contract neither party made full compliance with provisions in the contract requiring that the carrier initially acquiring a trailer to return it to the terminal of the carrier from which received at the place of receipt. In practice, trailers were exchanged at any convenient place and were also given to companies other than the owner in exchange for any trailer in possession of that company. Neither did the parties adhere to the provision for execution of Trailer Interchange Receipt and Inspection Reports, although Mr. Berry was able to furnish Navajo some 1900 of such forms.

Considerable cross-examination of Mr. Berry was directed to the accuracy of the records he kept, particularly Exhibits 2 through 31, with Mr. Berry maintaining at all times that they were accurate, particularly in accounting for the trailer-for-trailer exchange resulting in Tri-State's possession of the sixteen Navajo trailers.

Mr. Berry's cross-examination also went into transactions between Tri-State and carriers other than Navajo in an attempt to show that "any time in these interchanges that Tri-State comes out ahead a trailer, this would enable them to use that trailer to interchange with numerous lines and end up with a Navajo trailer for which they are not entitled to a trailer in return * * *." Upon objection that interchanges between Tri-State and any other companies were irrelevant to the issues of trailer-for-trailer exchanges between Tri-State and Navajo and whether such were even and in balance, defendant was permitted to inquire into records affecting specific interchanges between Tri-State and other companies "for the limited purpose of impeachment."

E. S. Gordon was the vice president of traffic for Tri-State. Mr. Gordon stated that his company, as a part of its business,

acted as a participating carrier in transportation of freight. In such operations, as pertinent here, shipments moved on government bills of lading and the destination carrier collected from the government. The initiating carrier would look to the carrier to whom it transferred a load of freight for the initiating carrier's portion of the total charge. " * * * it's an agreement that whoever collects the charges [from the government] owes the other [previous] carrier." If the charges are not collected by the succeeding carrier, such failure does not relieve that carrier of responsibility to pay the previous carrier.

By use of records, Exhibits 32–A through 32–P, Mr. Gordon described sixteen instances in which Tri-State was the initial carrier in participation with Navajo for delivery of munitions from various plants to the government at export sites on the west coast. In each instance, Tri-State, in keeping with the agreement covering collection of such charges, submitted its bill for its portion of the charges to Navajo. None of such bills was paid, demand for payment was made, and the total due was $13,518.26.

Cross-examination of Mr. Gordon involved a suggested credit of $3,833.67 due from Tri-State to Navajo. Such sum had at one time been credited to Navajo by Tri-State due to an error made by a rate clerk. The true amount due and claimed by Tri-State remained at $13,518.26.

Answers to interrogatories from Tri-State to Navajo admitted that Tri-State and Navajo acted as participating carriers in the sixteen shipments in question and that Navajo received the revenue for such shipments, all as shown on Exhibits 32–A through 32–P. Navajo also admitted it had not paid Tri-State its portion of such revenue. Also admitted by Navajo was its acquisition of license plates for the sixteen Navajo trailers in possession of Tri-State for 1968, 1969, and 1970, and that Navajo did not affix the plates to the trailers and did not deliver them to Tri-State.

Dennis P. Rago was vice president of line haul operations for Navajo Freight Lines, Inc. His company employed a "visual system" or daily inventory by terminal or movement of every trailer in its system. Around October 10, 1968, he made an unsuccessful demand on Tri-State to return the sixteen Navajo trailers in question. The demand was made upon Mr. Richard Berry. "He wanted a trailer [for each] in exchange." Mr. Rago determined that Navajo had 59 Navajo trailers "off line" to Tri-State, and that Tri-State had 27 Tri-State trailers "on line" to Navajo, to conclude that there was an imbalance of 32 Navajo trailers in favor of Tri-State. Subsequent interchanges reduced the imbalance in his figures to sixteen trailers, and demand for reimbursement for the imbalance was made on a basis of $10 per day, exclusive of Saturdays, Sundays, holidays, and two days of each interchange, amounting to $169,920.00 at time of trial.

Mr. Rago's company dealt with Tri-State alone on a trailer-for-trailer exchange basis; it dealt with all other companies on a per diem basis.

Cross-examination of Mr. Rago adduced that Navajo did not contend that it ever gave Tri-State a trailer for which Tri-State did not give Navajo a trailer in return. He agreed that when Navajo and Tri-State exchanged trailers it was on a trailer-for-trailer basis. He also agreed to the possibility that his calculated imbalance had nothing to do with trailer exchange between Tri-State and Navajo.

Charles Pettit was a vice president of United Transportation Investment Company, owner of 89% of Navajo Freight Lines, Inc. He placed the depreciated value of the sixteen Navajo trailers in possession of Tri-State at $29,335.00 and offered to transfer title to such trailers to Tri-State upon payment of such sum by Tri-State. The book value of such trailers on October 10, 1968, was $43,893.00.

With respect to the revenue claims arising from the participating carrier arrange-

ment between the parties, Mr. Pettit stated that Tri-State once agreed to a credit to Navajo against Tri-State's claim of some $13,000.00, but that conditions deteriorated and Tri-State ultimately refused the credit.

Tri-State's Count I for loss of use of the trailers in question was submitted by its Instruction No. 3:

"Your verdict must be for plaintiff on Count I of the plaintiff's claim for damages if you believe:

"First, plaintiff exchanged a trailer with the defendant for each of the sixteen Navajo trailers plaintiff has in its possession which were mentioned in the evidence, and

"Second, the defendant deprived the plaintiff of the use of the sixteen Navajo trailers, and

"Third, as a direct result of such deprivation the plaintiff sustained damage. (Not in MAI.)"

Tri-State's Count II for charges as a participating carrier was submitted by its Instruction No. 4:

"Your verdict must be for plaintiff on Count II of plaintiff's claim for damages if you believe:

"First, plaintiff acted as a participating carrier with the defendant in hauling the shipments of freight mentioned in the evidence, and

"Second, defendant did not pay plaintiff's charges for plaintiff's services in hauling the shipments of freight mentioned in the evidence, and

"Third, because of such failure, defendant's contract obligations were not substantially performed, and

"Fourth, plaintiff was thereby damaged. (Not in MAI.)"

Tri-State's instruction on damages was Instruction No. 6:

"If you find the issues in favor of the plaintiff on the plaintiff's claims for damages then you must award the plaintiff such sums as you believe will fairly and justly compensate the plaintiff for any damages you believe it sustained as a direct result of the occurrences mentioned in the evidence. MAI 4.01."

Navajo's Count I for loss of use of the trailers in question was submitted by its Instruction No. 7:

"Your verdict must be for defendant on Count I of defendant's counterclaim for damages, if you believe:

"First, plaintiff did not exchange a trailer with the defendant for each of the sixteen (16) Navajo trailers plaintiff has in its possession which were mentioned in evidence, and

"Second, the plaintiff deprived the defendant of the use of the sixteen (16) Navajo trailers, and

"Third, as a direct result of such deprivation the defendant sustained damage. (Not in MAI.)"

Navajo's Count II for charges as a participating carrier was submitted by its Instruction No. 8:

"Your verdict must be for defendant on Count II of defendant's counterclaim for damages if you believe:

"First, defendant acted as a participating carrier with the plaintiff in hauling the shipments of freight mentioned in evidence, and

"Second, plaintiff did not pay defendant's charges for defendant's services in hauling the shipments of freight mentioned in the evidence, and

"Third, because of such failure, plaintiff's contract obligations were not substantially performed, and

"Fourth, defendant was thereby damaged. (Not in MAI.)"

Navajo's Count III for deprivation of the trailers in question was submitted by its Instruction No. 9:

"Your verdict must be for defendant on Count III of defendant's counterclaim for damages if you believe:

"First, plaintiff was not entitled to a trailer in exchange for each of the sixteen Navajo trailers plaintiff has in its possession which were mentioned in evidence, and plaintiff has wrongfully refused to return said trailers to defendant, and

"Second, because of such refusal, plaintiff has deprived defendant of said trailers, and

"Third, defendant was thereby damaged. (Not in MAI.)"

Navajo's instruction on damages was Instruction No. 11:

"If you find the issues in favor of the defendant on defendant's counterclaim for damages, then you must award the defendant such sum as you believe will fairly and justly compensate the defendant for any damages you believe it sustained as a direct result of the occurrence mentioned in the evidence."

Forms of verdict were furnished the jury covering all verdict possibilities. The jury awarded plaintiff $146,740.00 on its Count I and $13,518.26 on its Count II; the jury found in favor of plaintiff and against defendant on defendant's counterclaim. Judgment was entered accordingly.

Citing *Begley v. Connor*, 361 S.W.2d 836, 839[3–5] (Mo.1962), that the rule entitling a successful plaintiff to a favorable view of the evidence does not authorize either the trial court or the appellate court to supply missing evidence or give plaintiff the benefit of other than reasonable inferences, appellant's Point I charges that Tri-State failed to make a submissible case in four specific respects:

■ Citing *Boehm v. Kindle*, 395 S.W.2d 284, 287[2–4] (Mo.App.1965), that a plaintiff in a suit on a contract must prove performance or show that failure to comply with its conditions did not work to disadvantage of the defendant, appellant contends (IA) that Tri-State failed to prove performance under the trailer interchange contract in that it failed to execute the Trailer Interchange

Receipt and Inspection Reports at the time of interchange under paragraphs 1 and 2 of the contract or, if it complied with such requirement, it failed to offer such Trailer Interchange Receipt and Inspection Reports in evidence, and argues that proof of exchanges resulting in acquisition of Navajo's trailers by Tri-State could be shown only by the appropriate Trailer Interchange Receipt and Inspection Reports.

The evidence shows that Tri-State did execute and keep Trailer Interchange Receipt and Inspection Reports. Mr. Berry used such as one of his sources in preparing his permanent record cards, Exhibits 2 through 31. After the permanent record was compiled, the information sources were no longer of value; however, he still was able to provide Navajo with over 1900 Trailer Interchange Receipt and Inspection Reports covering exchanges between Tri-State and Navajo. Navajo admitted in its opening statement that for business expedience, the parties, by custom, had modified the contract so that their trailers were exchanged with other carriers and for trailers owned by other carriers, and the form was therefore ineffective as a record of their business practice.

In such circumstances, provision for execution of the Trailer Interchange Receipt and Inspection Reports was waived by custom and practice between the parties; and breach, if so, of the provision would not affect Navajo's obligation to provide licenses for the Navajo trailers which it supplied in trailer-for-trailer exchanges under the contract. Accordingly, it does not appear that any failure of Tri-State to keep and produce Trailer Receipt and Inspection Reports worked to the disadvantage of Navajo, *Boehm v. Kindle*, supra; and proof of interchanges between the parties resulting in acquisition of the sixteen Navajo trailers in issue by Tri-State was supplied by Tri-State's permanent record cards, Exhibits 2 through 31.

■ Citing *Tnemec Company v. North Kansas City Development Co.*, 290 S.W.2d

169, 174[4–6] (Mo.1956), that courts are strict in evaluating sufficiency of evidence warranting recovery of damages for loss of profits, appellant contends (IB) that the evidence failed to establish that Tri-State had been damaged by being deprived of the use of the sixteen Navajo trailers. Appellant argues that Tri-State merely proved that in the trucking industry the customary charge for use of a similar trailer was $10 per day, and that it must have shown that it could profitably have used the trailers before it is entitled to damages.

This concession of proof of the measure of damages, $10 per day, is consistent with other admissions by defendant, defendant's own use of the same measure on its counterclaim, and the evidence that $10 per day excluding Saturdays, Sundays, holidays, and the first two days of interchange was the customary charge in the trucking industry. The evidence also shows that Tri-State could not use the trailers due to Navajo's failure to supply them with license plates, and if Tri-State had no need for the trailers it would not have cared whether they were licensed. The interchange contract contemplated the use by Tri-State of the trailers in question and Navajo's failure to license them caused Tri-State a loss of their use.

Plaintiff's damages for loss of use (not loss of profits) was properly measured at $10 per day for the 14,674 days as calculated under the industry custom, and the case comes within the proposition in 22 Am. Jur.2d Damages § 155, p. 223: "Courts have approved several methods for measuring damages for loss of use. One method which has received wide approval is to award the rental, or, as it is sometimes called, the 'usable' value, of the property. Rental or usable value is the amount for which the property in question could have been rented on the market * * *." And recovery for loss of use is allowable even though no substitute vehicle is rented. *Holmes v. Raffo*, 60 Wash.2d 421, 374 P.2d 536, 541–542[6–7] (1962); *Malinson Black*, 83 Cal. App.2d 375, 188 P.2d 788, 791–792[12–14] (1948).

Citing *Oonk v. Monarch Acc. Ins. Co.*, 199 S.W.2d 416, 419[3] (Mo.App.1947), that a plaintiff may not recover under a contract absent consideration moving between plaintiff and defendant, appellant contends (IC) that the evidence failed to establish that Tri-State exchanged a trailer with Navajo for each of the 16 Navajo trailers in Tri-State's possession, and that Tri-State had a right to use such trailers. Appellant argues that Tri-State did not prove, as claimed, that it exchanged trailers on a trailer-for-trailer basis, and the mere fact that Tri-State is presently in possession of 16 Navajo trailers does not support Tri-State's claim that it is entitled to a trailer in exchange for each Navajo trailer in its possession.

Mr. Berry's testimony, supported by Tri-State's permanent record of trailer interchanges, Exhibits 2 through 31, was that the 16 Navajo trailers were in possession of Tri-State and that their equivalent had been given in exchange to Navajo. Mr. Berry was able to and did give the date that each of the 16 Navajo trailers came into possession of Tri-State, the place where the interchange took place, and the trailer given Navajo by Tri-State in exchange for each such Navajo trailer. There is no evidence to the contrary.

Mr. Berry also testified that Tri-State was willing to return the 16 Navajo trailers to Navajo at such time as Navajo was ready to give Tri-State an equivalent trailer in exchange; and the trailer exchange contract provided that Tri-State had the right to use the trailers until the exchange occurred.

Accordingly, it may not be said that the evidence was insufficient for any reason advanced by appellant under Point IC.

Citing *Staples v. O'Reilly*, 288 S.W.2d 670, 673[1] (Mo.App.1956), that among the essential elements of a contract are mutuality of agreement and mutuality of obligation, appellant contends (ID) that the evidence failed to establish that Navajo was obligated to pay Tri-State's charges for freight-

hauling services in the instances when Tri-State and Navajo acted as participating carriers. Appellant argues that Tri-State, instead of seeking payment for its share of freight charges from the destination carrier who made or was to make collection from the government consignee, submitted its bills to Navajo; that Tri-State failed to show that Navajo agreed to act as Tri-State's collecting agent, and neither did Tri-State show that Navajo had been paid and in turn failed to reimburse Tri-State for its share of the charges.

Tri-State's claim under Count II arose from sixteen shipments of explosives under government manifests. Each involved three participating carriers with Tri-State acting as the initial carrier, Navajo as the intermediate carrier, and a third company as the destination carrier which collected or was to collect the total freight charge.

Mr. Gordon's testimony, supported by Exhibits 32–A through 32–P, was that the initial carrier would look to the carrier to whom it transferred the load for the initiating carrier's portion of the total charge under an agreement that whoever collects the charges pays the previous carrier, and that failure of the succeeding carriers in the participation scheme does not relieve a transferee carrier of its obligation to pay its transferor carrier. In accordance with the agreement, Tri-State submitted its bills to its transferee, Navajo, and some have not been paid. This was not disputed, and Navajo admitted it had received payment of Tri-State's share of the charges; that it had not made payment to Tri-State; and Navajo was not arguing that the revenue of some $13,000 was owed to Tri-State.

Accordingly, Tri-State's case on its Count II did not fail for insufficiency of evidence for any reason advanced by appellant under Point IC.

Appellant charges (II) that the court erred in admitting Exhibits 2 through 31 for reasons: A. The records and their contents were not the best evidence, *Padgett v. Brezner*, 359 S.W.2d 416, 422[3] (Mo.

App.1962); B. The contents of the records constituted hearsay on hearsay on hearsay, *Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, 431 S.W.2d 205, 210–212[12–16] (Mo.1968); *Baugh v. Life & Casualty Ins. Co. of Tenn.*, 307 S.W.2d 660, 666[6, 7] (Mo.1957); *Winterton v. Van Zandt*, 351 S.W.2d 696, 703[6, 7] (Mo.1961); *Kansas City Stock Yards Co. v. A. Reich & Sons, Inc.*, 250 S.W.2d 692, 700[18] (Mo. 1952); *Hamilton v. Missouri Petroleum Products Co.*, 438 S.W.2d 197, 201[7] (Mo. 1969); C. The records and their entries were not made at or near the time of the event they reflect took place; D. The entries on the record constituted secondary evidence in that they were made from other records not in evidence, *Pratt v. Missouri Pac. Ry. Co.*, 139 Mo.App. 502, 122 S.W. 1125, 1128 (1909); E. The records and their contents were inaccurate, were never verified with the original records and were so unreliable as to lack the necessary reliability to qualify their admission as business records.

Missouri's Uniform Business Records as Evidence Law provides, Section 490.680, RSMo 1969, that: "A record of an act, condition or event, shall * * * be competent evidence if the custodian * * * testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The Act removes and renders ineffective the objection that the record constitutes hearsay in that the preparer may not be present for cross-examination. Although a record shown to comply with the Act is itself admissible, the Act does not make admissible any evidence which would be incompetent if offered in person. *Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, supra. For example, a hospital record of a patient is admissible under the Act, but a recital in the record that "Pt. [patient]

states that * * * he * * * was told by a doctor he had a leaky heart," was properly excluded as hearsay on hearsay, *Baugh v. Life & Casualty Ins. Co. of Tenn.*, supra, 307 S.W.2d l. c. 666; a recital in a highway patrol report that a "car had been reported stolen to the Kansas City Police earlier in the day," was excluded as hearsay on hearsay as contrasted to an offer of the Kansas City police record showing a report of theft of the car which would present a different situation, *Winterton v. Van Zandt*, supra, 351 S.W.2d l. c. 702. Similar examples and distinctions appear in *Kansas City Stock Yards Co. v. A. Reich & Sons, Inc.*, supra, and *Hamilton v. Missouri Petroleum Products, Co.*, supra.

Mr. Berry did not quote any hearsay testimony, and his testimony shows that Tri-State's record of trailer interchange between Tri-State and Navajo, Exhibits 2 through 31, was prepared by Mr. Berry, the employee in charge of keeping Tri-State's permanent records of trailer interchanges; that the record was prepared in the usual course of business; that entries were made at or near the time of the event; that the record is kept under his control and supervision. He also described the sources of information, and produced some 1900 Trailer Interchange Receipt and Inspection Reports representative of one of the sources, and such reports were recognized in the agreement between Tri-State and Navajo as representative of an interchange of trailers between the parties. The trial court found admission of the records to be justified; defendant was permitted to cross-examine at length as to their credibility and reliability, and they did not contain hearsay statements as in the above citations of appellant.

Accordingly, it may not be said that the foundation for admissibility of Exhibits 2 through 31 as business records was not laid in compliance with the Act. Their admission was within the discretion accorded the court in such matters. *Rossomanno v. Laclede Cab Co.*, 328 S.W.2d 677, 683[14] (Mo. banc 1959); *Hicks v. Peniston*, 480 S.W.2d 522 (Mo.App.1972). See, e. g.: *Boland v.*

*Dehn*, 348 S.W.2d 603 (Mo.App.1961), where, even though plaintiff's described method of booking was unusual, its sales tickets were shown to be not only its original book of entries but also its account book and admissible under the Act as business entries; *Mutual Finance Co. v. Auto Supermarkets, Inc.*, 383 S.W.2d 296 (Mo.App. 1964), where plaintiff's ledger card, showing history of performance on account, identified by officer of plaintiff in charge of its office and the account in question, was admissible under the Act; *Hancock v. Crouch*, 267 S.W.2d 36 (Mo.App.1954), where an account book kept each day by plaintiff storekeeper was open to inspection by defendant owners and which showed the record of financial transactions, was admissible under the Act.

Appellant charges and argues (III) that the court erred (A) in excluding, except for impeachment purposes, evidence of trailer exchanges between Tri-State, Navajo, and other companies other than the exchanges whereby Tri-State acquired the sixteen Navajo trailers in question; and (B) in excluding testimony offered by Navajo through Tri-State's vice president, George W. Carter, by which Navajo offered to prove that Tri-State could not have lost use of Navajo's trailers for all the time claimed by Tri-State in that Tri-State was engaged in a suit with the Teamster's Union alleging business interruption, and evidence offered to show the number of trailers operated by Tri-State in 1967 and 1968 and acquisitions by Tri-State from other companies so as to more than double its fleet of trailers.

The questions in this respect were whether Tri-State had exchanged a trailer with defendant for each of the sixteen Navajo trailers Tri-State had in its possession, whether Navajo denied Tri-State their use, and whether Tri-State sustained damage as a result of loss of use. See Instruction No. 3, supra.

As previously demonstrated, Tri-State's records, Exhibits 2 through 31, constituted evidence showing that Tri-State did ex-

change a trailer for each of the sixteen Navajo trailers in Tri-State's possession, and under the contract Tri-State was entitled to their use. It has been demonstrated also how Tri-State lost the use of the Navajo trailers through Navajo's failure to license them for use, and that damages for such loss of use were properly measured at $10 per day for 14,674 days.

Whether Tri-State was out of balance in interchanges with other carriers is irrelevant. Tri-State had sixteen Navajo trailers for which, as shown, it had exchanged another trailer with Navajo. The general rule is that evidence "must be relevant to the issues and tend to establish or disprove them," 29 Am.Jur.2d Evidence, § 251, p. 299; and "No precise and universal test of relevancy is furnished by the law but the determination of whether particular evidence is relevant rests largely in the discretion of the court, which must be exercised according to the teachings of reason and judicial experience," 31A C.J.S. Evidence § 158, p. 431. Thus, e. g., it is improper to admit a defendant motorist's speed on occasions other than that at the time of the incident in question, *Taylor v. Schneider*, 370 S.W.2d 725 (Mo.App.1963); and it is proper to exclude evidence concerning bad faith of a plaintiff landlord in obtaining possession of premises other than those now sought to be recovered in forcible detainer proceedings against present defendant, *Radloff v. Penny*, 225 S.W.2d 498 (Mo.App. 1949).

Similarly, whether Tri-State was damaged as a result of business interruption laid to the Teamster's Union is not relevant to Tri-State's damages due to Navajo's deprivation of Tri-State's right to use the sixteen Navajo trailers.

Appellant charges the court erred (IV) in giving Instruction No. 3. Appellant contends that it was contrary to MAI, failed to hypothesize all elements necessary to recovery, submitted a theory of recovery on implied contract or quantum meruit instead of upon express contract, failed to require the jury to find any right in plaintiff to contin-

ue in use of the trailers or any corresponding duty and breach of duty of defendant to permit use of the trailers, failed to submit that plaintiff sustained any damage as a result of any breach of defendant, and was not supported by evidence.

Instruction No. 3 submitted Tri-State's Count I against Navajo for loss of use of the trailers in question; and it has been demonstrated that Tri-State made a case on Count I. The instruction was, therefore, supported by the evidence.

Neither MAI "26.02 Verdict Directing–Breach of Bilateral Contract–Breach Sole Issue," MAI "26.05 Verdict Directing–Quantum Meruit–Goods Furnished," nor MAI "26.06 Verdict Directing–Bilateral Contract–Terms of Agreement in Issue (New)," is applicable to this case. Accordingly, the court gave Instruction No. 3 as "Not in MAI," in which case the instruction "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.01(e), V.A.M.R.

■ The only issue under Tri-State's Count I was whether Tri-State gave Navajo a trailer for each of the sixteen Navajo trailers Tri-State had in its possession. Instruction No. 3 required the jury to believe such to be the case before it could find for plaintiff; and it is not disputed that Navajo failed to license the trailers resulting in a loss to Tri-State of the right of use of such trailers. Instruction No. 3 submitted these matters briefly, impartially, free of argument, and without requiring findings of detailed evidentiary facts in compliance with Rule 70.01, V.A.M.R. See Instruction No. 2 in *Hinkeldey v. Cities Service Oil Co.*, 470 S.W.2d 494, 496 (Mo.1971); Instruction No. 3 in *Gottlieb v. Hyken*, 448 S.W.2d 617, 619 (Mo.1970).

It also may be said that Instruction No. 3 is not a proper subject of appellant's charges of error because Navajo made an identical submission of Count I of its counterclaim by Instruction No. 7, supra.

■ On the same grounds, appellant contends the court erred (V) in giving Instruction No. 4.

Instruction No. 4 submitted Tri-State's Count II against Navajo for payment of Tri-State's services in hauling freight as a participating carrier with Navajo; and, again, it has been demonstrated that Tri-State made a case. on Count II. As with Instruction No. 3, Instruction No. 4 was, therefore, supported by the evidence.

Also, as with Instruction No. 4, there was no applicable MAI; and with defendant's admission that it owed Tri-State for the charges claimed, Instruction No. 4 submitted Tri-State's Count II in compliance with Rule 70.01, V.A.M.R.

It also may be said that Navajo is in no position to claim error with respect to Instruction No. 4 because, as with Instruction No. 7, Navajo made an identical submission of Count II of its counterclaim by Instruction No. 8, supra.

"Without again repeating the arguments previously made," appellant contends the court erred (VI) in giving Instruction No. 6.

Instruction No. 6 (MAI 4.01) was Tri-State's instruction on damages and it is identical to Navajo's Instruction No. 9 on damages. Consequently, Instruction No. 6 is free of appellant's charges for the same reasons given with respect to Instructions 3 and 4.

■ Appellant contends (VII) that the court erred in failing to direct a verdict for defendant on Counts II and III of its counterclaim. Appellant argues that there was no evidence to refute its entitlement under Count II to a credit of approximately $3,000 against the approximately $13,000 damages claimed by Tri-State under Count II of its petition. Appellant argues that there was no evidence to support Tri-State's right to retain possession of the sixteen trailers and, since there was thus no issue for the jury, a verdict should have been directed on defendant's Count III for the undisputed depreciated value of the trailers.

Tri-State did not have the burden of disproving it owed the "credit" of $3,833.67 to Navajo; Navajo had the burden of proof that Tri-State owed Navajo any money. Tri-State, through Mr. Gordon, adduced that a prior admission that Tri-State owed such credit was a mistake, that a rate clerk erred in giving the credit, and that Navajo did not participate in the subject hauls. If believed, and the jury apparently did so believe, such evidence showed that Tri-State was entitled to the $13,516.26 claimed under its Count II and that Navajo was not entitled to the $3,833.67 claimed under Navajo's Count III. There was thus a jury issue on Navajo's Count II, and no error occurred for failure to direct a verdict in favor of Navajo on Count II.

Count III of Navajo's counterclaim was founded on its allegation that Tri-State wrongfully possessed Navajo's trailers and wrongfully refused to return them. It has already been demonstrated in connection with Tri-State's Count I that Tri-State adduced evidence to show its entitlement to possession and use of the sixteen Navajo trailers. Accordingly, the court could not direct a verdict for Navajo on that issue.

Appellant's Point VII makes another complaint of the court's exclusion of evidence offered by defendant concerning trailer exchanges between plaintiff, defendant, and other companies. This has been ruled under Point III A and B, supra.

Finally, appellant contends (VIII) that the verdict is so excessive as to show bias, passion, and prejudice on the part of the jury and should be set aside. Appellant argues that the verdict is lacking in evidentiary support, and the jury's willingness to award damages without proof is evidence of its bias and prejudice. See *Hewitt v. Chicago, Burlington & Quincy Railroad Co.*, 426 S.W.2d 27, 32[8, 9] (Mo.1968).

There is nothing about this case to excite a jury and prejudice it against either side. The dispute concerned two trucking companies, both claiming to have been wronged

by the other, and the jury resolved the dispute.

It has been demonstrated how the $146,740.00 damages awarded Tri-State on Count I of its petition were supported. The number of days lost was calculated by customary practice, and both sides utilized the same per diem charge for loss of use of a trailer. And the only dispute with respect to Tri-State's claim of $13,518.26 damages on Count II of its petition was whether it was subject to a reduction or credit of $3,833.67 sought by Navajo on Count II of its counterclaim.

Judgment affirmed.

All concur.